**UNITED STATES**
v.
**NATIONAL FOOTBALL LEAGUE et al.**
No. 12808.

United States District Court,
E. D. Pennsylvania.

Nov. 12, 1953.

320

⚷12(6)

---

William L. Maher, W. Wilson White, U. S. Atty., Philadelphia, Pa., W. Perry Epes, Alexandria, Va., Walter D. Murphy, John A. S. Riles, Barbara J. Svedberg, Washington, D. C., and Leonard R. Posner, Hartford, Conn., Department of Justice, for plaintiff.

Francis J. Myers, Thomas Hart, Cornelius C. O'Brien, Alfred W. Putnam, Harry Shapiro, Hirsch W. Stalberg, Philadelphia, Pa., Milton W. King, Bernard I. Nordlinger, Washington, D. C., for defendants.

GRIM, District Judge.

Article X of the by-laws of the National Football League provides that no club shall cause or permit a game in which it is engaged to be telecast or broadcast by a station within 75 miles of another League City on the day that the home club of the other city is either playing a game in its home city or is playing away from home and broadcasting or televising its game by use of a station within 75 miles of its home city, unless permission for such broadcast or telecast is obtained from the home club.[1] The evidence is uncontradicted that it is the general policy of the clubs to refuse to permit the broadcasting or televising of "outside games"[2] in their home territories and that such permission has seldom been granted. Most League games, particularly regular season games, are played on Sundays, and since the teams, when they are not playing at home, almost always either broadcast or televise their "away games"[3] in their home territories, the restrictions of Article X effectively prevent "live" broadcasts or telecasts[4] of practically all outside games in all the home territories.

The government has filed this action seeking an injunction against the enforcement of the provisions of Article X, contending that they are illegal under the Sherman Act, 15 U.S.C.A. § 1 et seq., which provides:

"§ 1. Every contract, combination * * * or conspiracy in restraint of trade or commerce among the several states * * * is declared to be illegal * * *."

The by-laws have been agreed to by all the League members and are binding upon all of them. They clearly constitute a contract within the meaning of the word as it is used in the Sherman Act. Associated Press v. United States, 326 U.S. 1, 8, 65 S.Ct. 1416, 89 L.Ed. 2013.

An analysis of the provisions of Article X and of the evidence pertaining thereto shows that Article X contains four basic provisions material to this anti-trust suit. (1) It prevents the telecasting of outside games into the home territories of other teams on days when the other teams are playing at home. (2) It prevents the telecasting of outside games into the home territories of other teams on days when the other teams are playing away from home and permitting the telecast of their games into their home territories. (3) It prevents the broadcasting by radio of outside games into the home territories of other teams both on days when the other teams are playing at home and on days when the other teams are playing away from home and are permitting the games to be broadcast or televised into their home territories. (4) It gives the Football Commissioner an unlimited pow-

1. The following special provisions create exceptions to the general 75-mile rule: In the case of the Green Bay Packers the home territory includes all of Milwaukee County, which covers an area more than 75 miles from Green Bay. When League cities are within 100 miles of each other the territorial right of each extends to half the distance between the cities (e.g. New York and Philadelphia; Washington and Baltimore). Either club in Chicago (Cardinals or Bears) may permit broadcasting (but not telecasting) of its own games in Chicago without limitation.

2. An "outside game" is a game which is played outside the home territory of a particular home club and in which that home club is not a participant.

3. An "away game" is a game played by a particular home club outside of its own home territory.

4. "Live" telecasts are telecasts made simultaneously with the playing of the game as contrasted with movies of the game telecast subsequent to the playing of the game. "Live" broadcasts are radio broadcasts made simultaneously with the playing of the game as contrasted with sound recordings or transcriptions broadcast after the game has been played.

er to prevent any and all clubs from televising or broadcasting any or all of its or their games. Since the facts in reference to each of these provisions present somewhat different anti-trust law problems, they will be considered separately.

## I.

Is the provision which prevents the telecasting of outside games into the home territories of other teams on days when the other teams are playing at home illegal?

There can be little doubt that this provision constitutes a contract in restraint of trade. The market for the public exhibition of football no longer is limited to the spectators who attend the games. Since the advent of television and radio, the visual and aural projections of football games can be marketed anywhere in the world where there are television or radio facilities to transmit and receive them. When a football team agrees to restrict the projection of its games in the home areas of other teams it thereby cuts itself off from this part of its potential market. Since the clubs of the National Football League have agreed at certain times not to project their games into the home territories of other clubs they have given that part of their market at those certain times exclusively to other teams. In return, each of them has been given the right to market its own games without competition in its own home area under the same circumstances. The purpose and effect of this is to restrict outside competition on the part of other teams in the home area of each club. This, therefore, is a clear case of allocating marketing territories among competitors, which is a practice generally held illegal under the anti-trust laws. United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 427.

An allocation of marketing territories for the purpose of restricting competition, however, is not always ille-gal. There is no simple formula "to displace the rule of reason by which breaches of the Sherman Law are determined. Nor is 'division of territory' so self-operating a category of Sherman Law violations as to dispense with analysis of the practical consequences of what on paper is a geographic division of territory." Timken Roller Bearing Co. v. United States, 341 U.S. 593, 605, 71 S.Ct. 971, 978, 95 L.Ed. 1199 (dissenting opinion of Justice Frankfurter).

"The restrictions the act imposes are not mechanical or artificial. Its general phrases * * * call for vigilance in the detection and frustration of all efforts unduly to restrain the free course of interstate commerce, but they do not seek to establish a mere delusive liberty either by making impossible the normal and fair expansion of that commerce or the adoption of reasonable measures to protect it from injurious and destructive practices and to promote competition upon a sound basis. * * * Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it." Appalachian Coals, Inc. v. United States, 288 U.S. 344, 360, 53 S.Ct. 471, 474, 77 L.Ed. 825.

"The legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect,

actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences." Chicago Board of Trade v. United States, 246 U.S. 231, 38 S. Ct. 242, 244, 62 L.Ed. 683.

■ An agreement may constitute a restraint of trade, but that does not necessarily mean that it is illegal. To be illegal a contract must cause both a restraint of trade and an unreasonable restraint of trade. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533.[5]

The principal question in the present case is whether the particular restraints imposed by Article X are reasonable or unreasonable.

Professional football is a unique type of business. Like other professional sports which are organized on a league basis it has problems which no other business has. The ordinary business makes every effort to sell as much of its product or services as it can. In the course of doing this it may and often does put many of its competitors out of

business. The ordinary businessman is not troubled by the knowledge that he is doing so well that his competitors are being driven out of business.

Professional teams in a league, however, must not compete too well with each other in a business way. On the playing field, of course, they must compete as hard as they can all the time. But it is not necessary and indeed it is unwise for all the teams to compete as hard as they can against each other in a business way. If all the teams should compete as hard as they can in a business way, the stronger teams would be likely to drive the weaker ones into financial failure. If this should happen not only would the weaker teams fail, but eventually the whole league, both the weaker and the stronger teams, would fail, because without a league no team can operate profitably.

It is particularly true in the National Football League that the teams should not compete too strongly with each other in a business way. The evidence shows that in the National Football League less than half the clubs over a period of years are likely to be financially successful. There are always teams in the League which are close to financial failure. Under these circumstances it is both wise and essential that rules be passed to help the weaker clubs in their competition with the stronger ones and to keep the League in fairly even balance.

The winning teams usually are the wealthier ones and unless restricted by artificial rules the rich get richer and the poor get poorer (as Commissioner

---

5. At this late date in anti-trust law history it is not necessary to discuss the reason why a restraint of trade is illegal only if it is unreasonable. It is sufficient to say that if restraints are reasonable by common law standards they are legal under the Sherman Act. Justice Stone put it this way in Apex Hosiery Co. v. Leader, 310 U.S. 469, at page 498, 60 S. Ct. 982, at page 995, 84 L.Ed. 1311: "This Court has * * * repeatedly recognized that the restraints at which the Sherman law is aimed, and which

are described by its terms, are only those which are comparable to restraints deemed illegal at common law". Although there is much state common law on the subject of which restraints of trade are reasonable, (See Restatement, Contracts, Secs. 513 to 519) under the federal anti-trust statutes federal rather than state decisions are controlling. Compare Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, with Sola Electric Co. v. Jefferson Co., 317 U.S. 173, 176, 63 S.Ct. 172, 87 L.Ed. 165.

Bell put it). Winning teams draw larger numbers of spectators to their games than do losing teams and from the larger gate receipts they make greater profits than do losing teams. With this greater wealth they can spend more money to obtain new players, they can pay higher salaries, and they can have better spirit among their players than can the weaker teams. With these better and happier players they will continue to win most of their games while the weaker teams will continue to lose most of their games. The weaker teams share in the prosperity of the stronger teams to a certain extent, since as visiting teams they share in the gate receipts of the stronger teams. But in time even the most enthusiastic fans of strong home teams will cease to be attracted to home games with increasingly weaker visiting teams. Thus, the net effects of allowing unrestricted business competition among the clubs are likely to be, first, the creation of greater and greater inequalities in the strength of the teams; second, the weaker teams being driven out of business; and, third, the destruction of the entire League.

In order to try to keep its teams at approximately equal strength and to protect weaker teams from stronger teams, a league theoretically might use a number of devices. It might (1) limit the bonus price which could be paid to new players, (2) give the weaker teams a prior right over stronger teams to draft new players, (3) prohibit the sale of players after a certain day in the playing season, (4) limit the number of players on each team, (5) limit the total amount of salaries which a team can pay, (6) give the lowest team in the league the right to draft a player from the highest team, when and if the highest team has won a certain number (three for instance) of consecutive championships, and (7) reasonably restrict the projection of games by radio or television into the home territories of other teams.[6]

It is easy to see that the first six devices would make it easier for weaker teams to compete with stronger ones.[7] The usefulness of the seventh device, however, in the protection of the weaker teams may not be so obvious, particularly since it prevents the weaker teams from televising into the home territories of the stronger teams as much as it prevents the stronger teams from telecasting into the home territories of the weaker ones. The evidence indicates that television audiences and sponsors have so little interest in games between weak teams that it is very difficult to obtain sponsors for outside telecasts of such games. Consequently, the weaker teams lose practically nothing by this television restriction. But they benefit

6. These devices may be necessary to protect teams in comparatively small cities in their competition with teams in larger cities, because of the advantage which the larger population areas give to teams in the larger cities. The history of professional football does not show this, but its history on a sound basis is so short (the ruinous competition with the All-America Conference ended only in 1951) that it is not very illuminating. The experience of professional baseball, however, is illuminating on this point. The professional baseball team which has the only American League franchise in the New York area, the New York Yankees, has dominated professional baseball so much in the last thirty years that most of the other teams no longer have any real hope of winning a championship. This is harmful to professional baseball generally. Certainly it is not merely a coincidence that the professional baseball team which draws from a population area twice as large as its nearest competitor wins almost all the championships.

7. It should be made clear that the discussion relating to the first six protective devices and the note thereto is not based on evidence in the case and does not concern matters about which judicial notice can be taken. It is included for the purpose of pointing up professional football's very serious problem of maintaining a league of teams fairly equal in player strength and with a reasonable chance of operating at a profit. It provides a theoretical basis for an analysis of the seventh device, which, of course, is the subject matter of this case.

greatly from it in that the restriction adds to their home game attendance by preventing potential spectators from staying at home to watch on television exciting outside head-on games between strong teams. The competitive position of the weaker teams is improved by this increase in home attendance, while the competitive position of the stronger teams is weakened somewhat by their inability to sell to sponsors the right to televise their desirable head-on games into the home territories of the weaker teams when the weaker teams are playing at home.

A large part of defendants' evidence was directed to the question of whether the televising of a team's own home games [8] in that team's home territory has an adverse effect on attendance at these home games. The evidence on this point, particularly the evidence relating to the great decrease in home attendance of the Los Angeles Rams during the 1950 season when all its home games were televised at home, shows quite clearly that the telecasting of a home game into a home territory while the home game is being played has an adverse effect on the attendance at the game. This clearly indicates by implication that the telecast of an outside game, particularly a head-on game, also adversely affects attendance at a home game.

That the telecast of outside games into home territories adversely affects the attendance at home games is shown also by the experience of college football teams. Telecasts of games on the day they are played drastically and adversely affect gate receipts in the home area of the club where the television spectacle is shown. This is true whether the game being televised is an outside game or a home game as is shown by the National Opinion Research Center's studies. These studies are based solely upon data relating to the experience of college football with television, and because the testimony reveals some deficiencies in the methods pursued by the N. O. R. C.

in making its studies and interpreting its data, its conclusions cannot be taken at full face value. However, the conclusions in these reports concerning the adverse effect of telecasts of college outside games on attendance at college home games do indicate that the telecasting of outside professional football games would have a similar adverse effect upon attendance at home games of the professional teams.

The greatest part of the defendant clubs' income is derived from the sale of tickets to games. Reasonable protection of home game attendance is essential to the very existence of the individual clubs, without which there can be no League and no professional football as we know it today.

This is not a case of one industry fighting the competition of another, as for instance coal fighting the competition of oil, or railroads fighting the competition of trucks, or moving pictures fighting the competition of television. Football provides a magnificent spectacle for television programs and television provides an excellent outlet and market for football. They both can use and indeed need each other. By working together intelligently each will be an important adjunct to the other. The objective of the clubs in agreeing to a television blackout of the home territory (except for the remote possibility of a home game telecast) during the day a home game is played is not to restrain competition among the individual clubs in the sale of television rights or competition among television stations and networks and advertisers and advertising agencies in the purchase of such rights. This particular restriction promotes competition more than it restrains it in that its immediate effect is to protect the weak teams and its ultimate effect is to preserve the League itself. By thus preserving professional football this restriction makes possible competition in the sale and purchase of television rights in

---

8. There is no restriction on the right of each club to permit the telecast or broadcast of its own home games into its home territory.

situations in which the restriction does not apply.

■■■ The purposes of the Sherman Act certainly will not be served by prohibiting the defendant clubs, particularly the weaker clubs, from protecting their home gate receipts from the disastrous financial effects of invading telecasts of outside games. The member clubs of the National Football League, like those of any professional athletic league, can exist only as long as the league exists. The League is truly a unique business enterprise, which is entitled to protect its very existence by agreeing to reasonable restrictions on its member clubs. The first type of restriction imposed by Article X is a reasonable one and a legal restraint of trade.

Is the restriction on telecasting outside games in home territories when the home teams are playing away games and telecasting them in their home territories illegal?

The reasonableness of this particular restriction [9] must also be tested by its effect on the attendance and gate receipts of a team's home games. It is obvious that on a day when the home team is playing an away game there is no gate attendance to be harmed back in its home area and the prohibition of outside telecasts within its home area cannot serve to protect gate attendance at the away game, which is played in the opponent's home territory.

Several of defendants' witnesses attempted to justify the restriction with the opinion that it is necessary in this situation to protect the home team's "good will" by which they meant that the restriction is necessary to protect the home team from loss in gate receipts at subsequent home games. However, there is not one shred of evidence, not one specific example based on actual experience, to support this opinion which, more accurately stated, is nothing more than conjecture.

It is probably true, though not proved by the evidence, that the simultaneous telecasting of an outside game and an away game in the home area of the team playing away would result in a division of the television audience between the two games. Obviously the existence or the prospect of such competition would make the television rights to the home club's away games less attractive to sponsors and consequently less profitable to the club.[10] But this does not concern attendance at football games. Indeed, the testimony of defendants' witnesses consistently indicates that the primary reason for the restrictions in this situation actually is to enable the clubs in the home territories to sell monopoly rights [11] to purchasers of television rights to away games.

■■■ The record in this case contains no factual justification [12] for Article X's suppression of competing telecasts of League games when, for example, the Philadelphia Eagles' away game is being televised in its home territory. Defendants' speculation or conjecture that without such restriction gate attendance

---

9. This restriction, like the first and third restrictions, constitutes an allocation of marketing territories.

10. It is undoubtedly true, though again not proved by the evidence, that the telecasting of an outside game in a home territory would attract listeners from the broadcast of the home club's away game and thus make the broadcast rights to the away game less valuable to sponsors and the club.

11. "Monopoly rights" in this context may be defined as the right granted to a purchaser to be not only the exclusive telecaster of away game in the home team's territory, but also the right to be the only telecaster of any League game, regardless of the participants, on days when the away games are being played and televised back into the home territory.

12. The Government contends that an agreement which allocates marketing territories is a violation per se of the Sherman Act. With this contention I disagree. However, such an agreement, in my opinion, is prima facie a violation of the Act and it puts upon the defendants the burden of sustaining by evidence the reasonableness of the restraint of trade.

would decline a week or two later at the Eagles' home game has little probative value. Article X's restriction on this type of competition is an unreasonable and illegal restraint of trade.

### III.

Is the restriction of the broadcasting by radio of outside games in home territories on days when the home teams are playing at home and on days when the home teams are playing away games and are either televising or broadcasting them in their home territories illegal?

 There is no evidence whatsoever indicating any adverse effect of radio broadcasts of outside games in the home territory of another club. Since each of the defendant clubs permits the broadcasting in its home area of all of its own games (both away games and home games), it is apparent that none of them feels that such broadcasts have any significant adverse effect on gate attendance at their own games. Indeed, the evidence indicates that broadcasts of outside games when there is no home game have a stimulating effect on attendance at home games because of the interest thereby created in professional football generally. Granting monopoly rights to broadcasts of away games (that is, the right to broadcast away games in the home territory coupled with the suppression of competition from "outside" broadcasts or telecasts) enhances the value of such rights to purchasers, but has no significant effect on attendance at football games. There is no factual justification for Article X's territorial restrictions on the sale of radio broadcasting rights. Therefore, they are illegal under the Sherman Act.

### IV.

Is the power of the Football Commissioner to prevent all television and radio broadcasts of games illegal?

The fourth type of restriction imposed by Article X appears in the section which provides as follows:

"Section 1. Any contract entered into by any club for telecasting or broadcasting its games shall be subject to the conditions that:

"(a) The sponsor, the contract itself and the broadcasters who telecast or broadcast such games must have the written approval of the Commissioner of the National Football League."

 The decision of the Commissioner in approving or disapproving contracts for the sale of radio and television rights is final, binding, conclusive and unappealable. Thus this section gives the League Commissioner, an employee of the League, unlimited and arbitrary power to prevent the broadcasting and televising of any and every game. He need assign no reason for his action. By virtue of his power to disapprove any and all contracts for the sale of radio and television rights he has the power to set up and enforce the very same restrictions hereinbefore held to be illegal. Therefore, it is apparent that the Commissioner must be prohibited from exercising his veto power over contracts for the purpose of maintaining and enforcing these illegal territorial restrictions. Unless his power is limited in this manner, it would be a futile act for the Court to enjoin these illegal restraints. Accordingly, the enforcement of Section 1(a) of Article X will be enjoined in such a way that the Commissioner will be prohibited from exercising his power to disapprove contracts for the purpose of effecting and maintaining the territorial restrictions hereinbefore held to be illegal.

 Defendants contend that the action against them must be dismissed because professional football is not commerce or interstate commerce. This contention must be rejected. Radio and television clearly are in interstate commerce. Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L. Ed. 162; Allen B. Dumont Laboratories v. Carroll, 3 Cir., 184 F.2d 153. The restrictions by professional football on the sale of radio and television rights impose substantial restraints on the television and radio industry. Since the

League by-laws restrict substantially something which is in interstate commerce it is immaterial whether professional football by itself is commerce or interstate commerce. Mandeville Island Farms v. Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; United States v. Frankfort Distilleries, 324 U. S. 293, 65 S.Ct. 661, 89 L.Ed. 951; United States v. Crescent Amusement Co., 323 U.S. 173, 183, 65 S.Ct. 254, 89 L.Ed. 160. On this problem the Supreme Court has said in United States v. Women's Sportswear Ass'n, 336 U.S. 460, at page 464, 69 S.Ct. 714, at page 716, 93 L.Ed. 805:

"The trial court appears to have dismissed the case chiefly on the ground that the accused Association and its members were not themselves engaged in interstate commerce. This may or may not be the nature of their operation considered alone, but it does not matter. Restraints, to be effective, do not have to be applied all along the line of movement of interstate commerce. The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."

I am not unmindful of the decisions of the Supreme Court in Federal Base Ball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, and in the very recent cases, decided November 9, 1953, of Toolson v. New York Yankees, Inc., (Kowalski v. Chandler, and Corbett v. Chandler,) 73 S.Ct. 78. In those baseball "reserve clause" cases the Court dismissed anti-trust suits against the major professional baseball leagues on the theory that big-league baseball is a sport, local in its nature, and not interstate commerce. The only restriction alleged in the baseball cases was in the

internal operation of professional baseball itself. The only question involved in those cases was whether professional baseball itself is interstate commerce. No question of restrictions on the sale of radio and television rights was involved in those cases. The present case, on the other hand, primarily concerns restrictions imposed by the National Football League on the sale of radio and television rights. Therefore, the present case basically concerns the League's restraint of interstate commerce in the radio and television industries. It is obvious that whether professional football itself is or is not engaged in interstate commerce is immaterial in the present case and that the decisions in the baseball cases referred to do not control the present case.

### V.

### Findings of Fact.

Article X of the by-laws of the National Football League (as in force since 1951) provides:

"Section 1. Any contract entered into by any club for telecasting or broadcasting its games shall be subject to the conditions that:

"(a) The sponsor, the contract itself and the broadcasters who telecast or broadcast such games must have the written approval of the Commissioner of the National Football League;

"(b) Any broadcaster may be removed by the Commissioner for conduct considered by the Commissioner as detrimental to the National Football League or professional football;

"(c) The Constitution and By-Laws of the National Football League as the same may be from time to time amended, shall be a part of said contract.

"Section 2.

"(a) Subject to the limitations herein set forth, teams participating in any game, are authorized to telecast and broadcast the same;

"(b) No club shall cause or permit a game in which it is engaged, to be telecast or broadcast into any area included within the home territory of any other club, without the consent of such other club, on the day that such other club is:

"(i) Engaged in playing a game at home or

"(ii) Engaged in playing a game away from home, and causing or permitting telecast or broadcast of that game within its home territory.

"(iii) No club shall telecast in territory in which said game is played without the consent of the home club, the visiting club, and the Commissioner of the National Football League.

"(c) Notwithstanding the foregoing restriction:

"(i) Either club in Chicago may in Chicago permit or cause broadcasting (but not telecasting) of its own games without limitation;

"(ii) Either club in New York may in New York permit or cause broadcasting (but not telecasting) of its own games without limitation.

"(d) No club shall accept or receive compensation of any kind whatever as consideration for a grant of the consent referred to in subsection (b) hereof.

"Section 3. Each League club hereby grants to each other League club, when such other club is the visiting club, the right to telecast and broadcast games in which the visiting club participates, from a station or stations within the home territory of such visiting club.

"Section 4. The sale of radio and television and film rights for the World Championship Game between the winners of the American Conference and the National Conference shall be under the sole jurisdiction of the Commissioner except that:

"(a) The home club may broadcast on a non-exclusive basis by radio locally only, within the home territory of said club, provided said club pays into the player pool a sum equal to one-twelfth ($\frac{1}{12}$) of the total amount paid for the radio and television rights of that club for that season and the Commissioner approves the sponsor, and broadcasters;

"(b) The visiting club may telecast and broadcast on a nonexclusive basis within the home territory of said club, provided said club pays into the player pool a sum equal to one-twelfth ($\frac{1}{12}$) of the total amount paid for the radio and television rights of said club for that season and the Commissioner approves the sponsor and broadcasters.

"Section 5. Each club when playing at home shall provide adequate space for use of the visiting club in telecasting or broadcasting each game, if the visiting club shall so request.

"Section 6. The player grants to the club controlling his contract and to the National Football League severally and jointly the privilege and authority to use his name and/or picture for publicity and/or advertising purposes in newspapers, magazines, motion pictures, game programs and annual roster manuals, radio material, television telecast, and all other publicity and/or advertising mediums providing such publicity and/or advertising does not in itself constitute an endorsement by that individual player of a commercial product."

The statements of fact contained in the opinion will constitute the Court's findings of fact in the case.

The following of plaintiff's requests for findings of fact are affirmed and adopted as the Court's additional findings of fact in the case: Nos. 1 to 5, inclusive; No. 6, except for the first sentence; Nos. 7 to 17, inclusive; No. 18, except for that part of the first sentence following "In 1951"; No. 19, except for the first sentence which is ambiguous; Nos. 20 to 25, inclusive, Nos. 27 to 35, inclusive.

All the other requests by plaintiff for findings of fact are denied.

The following of defendants' requests for findings of fact are affirmed and adopted as the Court's additional findings of fact in the case: No. 1; Nos. 3 to 9, inclusive; Nos. 13 and 14; No. 21, but with "appropriate" underlined; No. 46, with the reservation that it does not state all the purposes of Article X, Nos. 47 to 50, inclusive; No. 53, except for the last sentence; and No. 55.

All the other requests by defendants for findings of fact are denied.

## VI.

### Conclusions of Law.

The statements of law contained in the Opinion will constitute the Court's conclusions of law in the case.

The following of plaintiff's requests for conclusions of law are affirmed and adopted as the Court's additional conclusions of law in the case: Nos. 1 and 5. The others are denied.

The following of defendants' requests for conclusions of law are affirmed and adopted as the Court's additional conclusions of law in the case: Nos. 1, 4, 10, 14 and 18.

All the other requests by defendants for conclusions of law are denied (No. 13 for being ambiguous).

If there are any inconsistencies between the requests which have been affirmed and adopted and the findings of fact and conclusions of law appearing in the Opinion, those contained in the Opinion shall govern.

## VII.

Accordingly, a decree may be entered dismissing plaintiff's claim for injunctive relief with respect to Article X's restriction on the telecast of outside games into a club's home territory when that club is playing at home, and enjoining the following illegal activities authorized by Article X:

(1) The restriction of the sale of rights for the telecasting of outside games in a club's home territory on a day when the home club is permitting the telecast of its away game in its home territory; (2) All territorial restrictions on the sale of radio broadcasting rights; and (3) The exercise of the Commissioner's power under Article X to disapprove contracts for the purpose of effecting the same two types of illegal restrictions mentioned in this paragraph.

Each side will submit a proposed decree within thirty days of the filing of this Opinion.