**COLORADO HIGH SCHOOL ACTIVITIES ASSOCIATION, et al.,
Plaintiffs,**

v.

**NATIONAL FOOTBALL LEAGUE, et al., Defendants.**

**Civ. A. No. 80–C–858.**

United States District Court,
D. Colorado.

Sept. 28, 1981.

Gerald A. Caplan, Alexander Halpern, Caplan & Earnest, Boulder, Colo., for plaintiffs.

Jeffrey H. Howard, Donald E. Phillipson, Glenn Merrick, Davis, Graham & Stubbs, Denver, Colo., for defendants NFL/Pete Rozelle.

H. Richard Schumacher, Cahill, Gordon & Reindel, New York City, James C. Ruh, Ireland, Stapleton & Pryor, Denver, Colo., for defendants NBC, Inc.

John R. Webb, Richard O. Schrepferman, Holme, Roberts & Owen, Denver, Colo., for defendants General Electric Broadcasting Co. of Colo., Inc.

Gordon G. Greiner, Peter C. Houtsma, Holland & Hart, Denver, Colo., for defendants CBS, Inc./McGraw Hill Broadcasting Co., Inc.

### MEMORANDUM OPINION

CARRIGAN, District Judge.

Plaintiffs, Colorado High School Activities Association (hereafter "CHSAA"), Boulder Valley School District No. RE–2, and Jefferson County School District No. R–1, sued the defendants alleging that their professional football television broadcast agreements violate both federal and state antitrust laws. Defendants are the National Football League, Pete Rozelle, CBS, Inc., National Broadcasting Company, Inc.,

McGraw-Hill Broadcasting Company, Inc., and General Electric Broadcasting Company of Colorado, Inc.

After substantial discovery by all parties, the plaintiffs moved to amend their complaint to allege more fully violations of the Sherman Act, 15 U.S.C. § 2, and the Colorado Restraint of Trade and Commerce Act, § 6–4–101, C.R.S. 1973. A hearing was held September 21, 1981 on that motion to amend and on cross-motions in which all parties sought summary judgment.

Plaintiffs' motion to amend the complaint was granted.

Defendants' motions for summary judgment were granted, and the plaintiffs' motion for summary judgment was denied, subject to supplementation by written findings of fact and conclusions of law.

Defendants contend that they are entitled to judgment as a matter of law based on 15 U.S.C. § 1293, which establishes procedural prerequisites conditioning the plaintiffs' rights to pursue federal antitrust claims against these defendants. Plaintiffs argue that they are entitled to partial summary judgment because they have met § 1293's threshold requirements. Section 1293 is part of the Professional Sports Telecasting Act, 15 U.S.C. §§ 1291–95.

The Professional Sports Telecasting Act was adopted to relieve professional sports from two decisions holding them subject to federal antitrust laws. *United States v. National Football League*, 196 F.Supp. 445 (E.D.Pa.1961); 116 F.Supp. 319 (E.D.Pa. 1953). As originally enacted in 1961, § 1291 created an *exemption* from the antitrust laws for television broadcasting of professional football, baseball, basketball or hockey games.

Section 1293, however, created an *exception* to the § 1291 exemption. The § 1293 exception was designed, initially, to protect intercollegiate football from the potentially devastating effects of competing for crowds against televised professional football games. In 1966, Congress amended § 1293 in an effort to broaden its protection to cover high school, as well as college, football programs.

Section 1293 provides:

"The first sentence of section 1 of this Act [15 USCS § 1291] shall not apply to any joint agreement described in section 1 of this Act [15 USCS § 1291] which permits the telecasting of all or a substantial part of any professional football game on any Friday after six o'clock postmeridian or on any Saturday during the period beginning on the second Friday in September and ending on the second Saturday in December in any year from any telecasting station located within seventy-five miles of the game site of any intercollegiate or interscholastic football contest scheduled to be played on such a date if—

(1) such intercollegiate football contest is between institutions of higher learning both of which confer degrees upon students following completion of sufficient credit hours to equal a four-year course, or (2) in the case of an interscholastic football contest, such contest is between secondary schools, both of which are accredited or certified under the laws of the State or States in which they are situated and offer courses continuing through the twelfth grade of the standard school curriculum, or the equivalent, and (3) such intercollegiate or interscholastic football contest and such game site were announced through publication in a newspaper of general circulation prior to August 1 of such year as being regularly scheduled for such day and place."

Section 1293's salient feature is its requirement that television broadcasts of professional football be blacked out within 75 miles of a protected high school or college football game. In order to qualify for § 1293's protection, and thus force the television stations within 75 miles to black out a professional game, the college or high school must meet the conditions of § 1293. That meeting these conditions is prerequisite to a school's right to invoke § 1293's exception, and thus suspend the "normal"

antitrust exemption in § 1291, is clear from the word "if" that prefaces § 1293's requirements.

The third condition is here at issue. It requires that, on or before August 1 of the year a particular game is to be played, the college or high school seeking § 1293 protection publish a notice of the game date and "game site" in a newspaper of general circulation. If the required notice is not published, that game is not protected by § 1293. This case turns on the meaning of the phrase "game site."

In 1977, the CHSAA timely published an announcement that the Colorado state 4A football championship game would be played "in Denver" on December 10, 1977 at 1 p. m. In 1978, timely notice was published that the championship game would be played "in the Denver metropolitan area" on December 9, 1978 at 1 p. m. In 1979, there was timely publication that the championship game was scheduled for the "Denver metropolitan area," on December 8, 1979 at 1 p. m.

Plaintiffs claim that the notices given in 1977, 1978, and 1979 sufficiently designated a "game site" within the meaning of § 1293. Defendants disagree, asserting that, as a matter of law, the three notices were insufficient to invoke § 1293 protection, and, therefore, summary judgment is required.

Plaintiffs contend that no more specific notice could have been given because CHSAA's practice is to conduct football championship playoffs and designate one of the two finalists as the "home team" at whose field the championship game will be played. It is argued that this practice is consistent with traditional high school playoff arrangements and with the pattern followed by high school associations in a large number of states to select the site of their championship game. Plaintiffs further argue that Congress did not intend, by enacting § 1293, to disrupt this traditional practice.

Defendants complain that CHSAA's published notices fail to mention the "game site," and that Congress used those words in their ordinary sense to require notification of a particular football field or stadium. They argue that no other reading of the statute would effectuate Congress' intent, and that the plaintiffs' construction of the statute would permit high school associations to "hold hostage" the television broadcast stations within 75 miles of a very large, vaguely described geographic area such as a metropolitan area. They further argue that Congress has given high schools a choice between their traditional practice and an alternative practice which would permit them to invoke § 1293's exemption.

In my view, most of the parties' arguments are policy arguments properly to be addressed to Congress. When Congress uses plain words or words of ordinary meaning in a statute, a court's duty is to apply the law giving those words their usual meaning. Proper regard for the separation of powers among the branches of the federal government, and due respect for the function of Congress vis-a-vis the judiciary, constrains the courts not to distort by interpretation simple and straightforward statutory language.

In my opinion the term "game site" is as plain, common and clear as the term "construction site" in a mechanics lien case or "work site" in a labor dispute. "Game site" means the football field or stadium where the game is to be played. There is no evidence in this record that Congress intended these words to have any meaning other than their obvious, everyday sense. Although the plaintiffs have made the strongest possible argument that Congress' desire to protect high school football from ruinous competition included congressional recognition and approval of playoff practices similar to CHSAA's, this argument is not persuasive in light of § 1293's clear language.

Section 1293 attempts to accommodate the needs of high school and college sports within its broader purpose of exempting professional sports telecasting from antitrust prohibitions. The 75-mile radius of protection was apparently considered the reasonable drawing area within which there would be serious competition between

school and college games on the one hand and telecast professional games on the other. To provide that circular umbrella of protection there had to be a point from which its radius could be measured, and limited, to 75 miles. A field or stadium "game site" conveniently provides such a point. A city, such as Denver, or an even more ambiguous term such as "the Denver Metropolitan area," does not provide a geographical point from which one may begin to measure 75 miles.

In addition, the words "game site" were not first added to § 1293 in 1966 when its protection was extended to high school football. Rather, the term "game site" was used in 1961 when § 1293 covered only college football. High school football championship playoff systems and practices were not used in intercollegiate football. In fact, the usual practice in college football was and is to designate and publish game sites, *i. e.*, stadium sites, years in advance. Major college post-season football games, such as bowl games, are usually held at well known non-movable sites.

For these reasons, I hold that the plaintiffs failed to give adequate notice of their 1977, 1978, and 1979 championship "game sites," and therefore these games did not qualify for § 1293's exception to the antitrust exemption conferred upon professional football television broadcast agreements by § 1291.

Defendants' motions for summary judgment are granted. Plaintiffs' motion for summary judgment is denied, and the plaintiffs' federal antitrust claims are dismissed for failure to state a claim upon which relief can be granted.

Since complete diversity between the plaintiffs and the defendants does not exist, jurisdiction over the plaintiffs' state law claims is pendent jurisdiction only. With the dismissal of the plaintiffs' federal antitrust claims, it is no longer appropriate to exercise pendent jurisdiction over these claims, and the plaintiffs' state law claims are dismissed without prejudice for lack of subject matter jurisdiction.

Accordingly,

IT IS ORDERED that the plaintiffs' federal antitrust claims are dismissed, with prejudice, for failure to state a claim upon which relief can be granted.

It is further ORDERED that the plaintiffs' state antitrust claims are dismissed, without prejudice, for lack of subject matter jurisdiction.

It is further ORDERED that each party shall bear his or its own costs.