

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-9-1999

# Shaw v. Dallas Cowboys

Precedential or Non-Precedential:

Docket 98-1629

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Shaw v. Dallas Cowboys" (1999). *1999 Decisions.* Paper 94.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/94

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 9, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-1629 and 98-1887

CHARLES SHAW; BRET D. SCHWARTZ; STEVE
PROMISLO, INDIVIDUALLY, AND ON BEHALF OF ALL
PERSONS SIMILARLY SITUATED

v.

DALLAS COWBOYS FOOTBALL CLUB, LTD.; NEW
ENGLAND PATRIOTS FOOTBALL CLUB; NEW YORK
GIANTS FOOTBALL, INC.; PHILADELPHIA EAGLES
LIMITED PARTNERSHIP; SAN FRANCISCO FORTY-
NINERS, LTD.; NATIONAL FOOTBALL LEAGUE,
        Appellants

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 97-cv-05184)

Argued March 11, 1999

Before: MANSMANN, SCIRICA and NYGAARD,
Circuit Judges.

(Filed April 9, 1999)

        Howard J. Sedran, Esquire
         (ARGUED)
        Donald E. Haviland, Jr., Esquire
        Levin, Fishbein, Sedran & Berman
        510 Walnut Street
        Suite 500
        Philadelphia, PA 19106

On the Brief:

Michael D. Hausfeld, Esquire
Daniel Small, Esquire
Cohen, Milstein, Hausfeld & Toll
1100 New York Avenue, NW
Suite 500, West Tower
Washington, D.C. 2005

William Bernstein, Esquire
Joseph R. Saveri, Esquire
Lieff, Cabraser, Heimann &
 Bernstein, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111

Samuel D. Heins, Esquire
Daniel E. Gustafson, Esquire
Heins, Mills & Olson, P.L.C.
700 Northstar East
608 Second Avenue South
Minneapolis, MN 55402

David T. Shulick, Esquire
Frank & Rosen
1601 Market Street, Suite 2230
Philadelphia, PA 19103

Roberta D. Liebenberg, Esquire
Liebenberg & White
The Pavilion, Suite 810
261 Old York Road
Jenkintown, PA 1910-46

Allyn Z. Lite, Esquire
Goldstein, Lite & DePalma
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003

Ira Neil Richards, Esquire
Trujillo, Rodriguez & Richards,
 LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA 19103

Dennis Stewart, Esquire
Milberg Weiss Bershad Hynes
 & Lerach
600 West Broadway
1800 One Americas Plaza
San Diego, CA 92101-5050

March Edelson, Esquire
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901

Joseph C. Kohn, Esquire
Kohn, Swift & Graf, P.C.
1101 Market Street, Suite 2400
Philadelphia, PA 19107

Bruce McNew, Esquire
Taylor Gruver & McNew, P.A.
3711 Kennett Pike, Suite 210
Greenville, DE 19807

Gregory Veith, Esquire
P.O. Box 378
Wynnewood, PA 19096

 COUNSEL FOR APPELLEES

Peter J. Nickles, Esquire
Timothy C. Hester, Esquire
 (ARGUED)
Neil K. Roman, Esquire
Covington & Burling
1201 Pennsylvania Avenue, N.W.
P.O. Box 7566
Washington, D.C. 20044-7566

3

          Richard P. McElroy
          Blank Rome Comisky & McCauley
          One Logan Square
          Philadelphia, PA 19103

           COUNSEL FOR APPELLANTS

OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this appeal involving a certified question, we must
determine, as a matter of first impression, whether an
agreement among members of the National Football League[1]
to sell broadcast rights jointly to satellite distributors is
exempt from scrutiny under the Sherman Act, 15 U.S.C.
SS 1 et seq. Citing the Sports Broadcasting Act (the "SBA"),
15 U.S.C. S 1291, the NFL sought dismissal of a class
action antitrust suit brought by Charles Shaw, Bret D.
Schwartz, and Steven Promislo ("Shaw"). The NFL asserted
that the rights being sold were "residual" rights in a
"sponsored telecasting" and therefore within the SBA's
exemption to the antitrust laws. The District Court rejected
this characterization, holding that the statutory exemption
turns on the nature of the broadcast in question and that
the phrase "sponsored telecasting" exempts only a
commercially sponsored free broadcast. The District Court
further observed that the SBA's legislative history
contradicts the NFL's interpretation and that exceptions to
the antitrust laws must be narrowly construed.

Accordingly, we must first determine whether the SBA
unambiguously exempts from antitrust law scrutiny only
the right to sell those images for commercially sponsored
free broadcast. If not, we must turn to the Act's legislative
_____

1. The members of the National Football League which are parties to the
agreement and to this action are the: Dallas Cowboys Football Club,
Ltd.; New England Patriots Football Club; New York Giants Football,
Inc.; Philadelphia Eagles Limited Partnership; and San Francisco Forty-
Niners, Ltd. We refer to these members and the League itself collectively
as the "NFL".

history. Because we agree with the District Court that it does, we will affirm.

I.

The NFL and its member teams own all rights to make and distribute images of football performances (the "games") between the teams. By agreement, they permit the broadcasting of approximately a dozen NFL games each week on free television networks, such as NBC or Fox. Because different games are broadcast within different local markets, however, any television viewer has free access to only two or three NFL games.2 This leaves an unserviced market for those NFL games outside a viewer's local broadcast area (e.g., the Pittsburgh Steelers fan who lives in Los Angeles). With the development and expansion of satellite distribution, that market can now be tapped. The NFL and member teams entered into a pooled agreement to sell jointly their rights in all football games broadcast nationwide to a satellite broadcast distributor (DIRECTV) which in turn offers those games as an all-or nothing package (the "NFL Sunday Ticket") to individual viewer-subscribers at a fixed cost per season.3

Shaw filed this class action suit, alleging that the NFL's joint agreement with the satellite distributor violates Section 1 of the Sherman Act4 and seeking declaratory and injunctive relief. Specifically, Shaw alleges that the combined agreement causes artificially high and

_____

2. Shaw v. Dallas Cowboys Football Club, Ltd. , 1998 WL 419765, *1-2 (E.D. Pa. June 23, 1998).

3. This cost is in addition to the subscriber's monthly satellite access fee.
Id. at *2.

4. The antitrust laws were designed for the protection of the public. Under Section 1 of the Sherman Act, as interpreted by the Supreme Court, agreements which unreasonably restrain trade are illegal. See, e.g., Standard Oil v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). To make out a Section 1 violation, plaintiffs must prove: (1) a contract, combination or conspiracy; (2) a restraint of trade; and (3) an
effect on interstate commerce. See Fuentes v. South Hills Cardiology, 946 F.2d 196, 198 (3d Cir. 1991).

noncompetitive prices for NFL satellite broadcasts and restricts the options available to NFL fans.

The NFL filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), alleging that (1) the pooled sale to the satellite distributor is a sale of "residual" rights in a "sponsored telecast" exempted from antitrust law under the SBA, and (2) Shaw failed adequately to allege the necessary joint action. The District Court denied the NFL's motion on both grounds and, at the NFL's request, certified the question of SBA exemption for interlocutory review. 5

II.

Congress passed the Sports Broadcasting Act in 1961 in response to a federal court ruling6 that the NFL's package sale of games to a commercial television network (CBS) violated the Sherman Antitrust Act, 15 U.S.C. S 1. Its purpose was to preserve the availability of NFL games on free broadcast television.7 The SBA therefore exempts from the antitrust laws:

> any agreement by or among persons engaging in or conducting the organized professional team sports of football, . . ., by which any league of clubs participating in professional football . . . contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, . . . engaged in or conducted by such clubs.

15 U.S.C. S 1291 (emphasis added). Our first task is to consider the plain meaning of the statute, heeding the

_____

5. Our appellate jurisdiction lies pursuant to 28 U.S.C. S 1292(b).

6. See United States v. National Football League, 116 F. Supp. 319 (E.D. Pa. 1953).

7. See, e.g., S. Rep. No. 1087, 1961 U.S.C.C.A.N. at 3044 (noting the Senate Judiciary Committee's concern for "the public interest in viewing professional league sports"). See generally U.S. Football League v. National Football League, 842 F.2d 1335, 1346-7 (2d Cir. 1988) (discussing history of agreements between the NFL and major television networks and history of the SBA).

Supreme Court's direction that exceptions to the antitrust laws must be narrowly construed.8

As the District Court explained and as the NFL does not dispute, the phrase "sponsored telecasting" refers to broadcasts which are financed by business enterprises (the "sponsors") in return for advertising time and are therefore provided free to the general public. Shaw, 1998 WL 419765, *3. Although the NFL concedes that a package of satellite broadcasts sold to individual subscribers is not a "sponsored telecasting", it asserts that its pooled sale to the satellite distributor is nonetheless within the SBA's antitrust law exemption because it constitutes a sale of residual or retained rights in the sponsored telecasts, i.e., that it is "part of [those] rights."

The NFL correctly asserts that it "still own[s] a partial right to the games broadcast by the free networks." Id. at *2. It errs when it characterizes its remaining rights as rights in the sponsored telecasts. The NFL's underlying rights are in the games themselves and, more specifically, they include the right to sell the images of those games for broadcast through various media. The broadcast rights sold to sponsored telecasters do not subsume the separate broadcast rights sold to a non-sponsored medium. 9 Each

_____

8. See, e.g., Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 126, 102 S. Ct. 3002, 73 L.Ed.2d 647 (1991) (holding that exceptions to the antitrust laws are narrowly construed, as they circumvent Congress's commitment to open competition).

9. The NFL attaches great significance to the fact that the satellite broadcasts utilize the same images as the sponsored telecasts, fed from the same network television cameras. The use of the same signal for broadcast over two media, however, does not render the rights in one broadcast derivative of rights in the other. One could just as readily conclude that the network television broadcast rights are derivative, and constitute part of the NFL's rights in the non-sponsored satellite broadcast. The network's provision of cameras and commentary does not remove the arbitrariness of calling one broadcast derivative of the other. Exemption from the antitrust laws cannot be predicated on the simple expedient of assigning ownership of cameras or payment of camera crews and commentators to a television network. Rather, it is predicated on the "sponsored telecast" of the image, i.e., its transmission in a form freely receivable by the public.

7

transaction is a sale of a part of the NFL's underlying right in the images of the games, but only the former is exempt from antitrust scrutiny. We agree with the District Court that one looks to the nature of "the broadcast which goes to these particular plaintiffs." Id. at *3. As that court observed, to hold otherwise – to adopt the construction urged by the NFL – would allow the exception to swallow the rule: a sponsored telecast to a limited geographic area would secure an antitrust law exemption for nationwide sales.10

III.

In light of the NFL's contentions regarding the meaning of the statutory provisions, the District Court considered the SBA's legislative history and concluded that it demonstrated that the Act did not exempt the challenged sale. See id. at *4. Although we need not turn to the Act's legislative history, we do so because the District Court examined it in detail.

Our review of the Act's legislative history also leads us to conclude that it clearly reflects Congress's intent, and the NFL's express contemporaneous concurrence, that the Act address only the sale of games to a sponsored television network. See Telecasting of Professional Sports Contests: Hearing before the Antitrust Committee of the House Committee on the Judiciary on H.R. 8757, 87th Cong. 1st Sess. at 4 (Sept. 13, 1961) (stating that the bill applies to "sponsored telecasting" and "does not apply to closed circuit or subscription television");11  Id. at 36 (Aug. 28,

_____

10. See id. ("Were the rule otherwise, the NFL could circumvent the statutory confines, nullify the statutory scheme, simply by always using earlier broadcasts with commercials. . . . [T]o construe the statute that way would cause [it] to self-destruct -- an absurd result.").

11. Subsequent congressional hearings characterized subscription television as a "program to be received by members of the public only upon the payment by such members of a charge, fee, or other form of direct compensation." See Subscription Television, Hearings Before the Subcommittee on Communications and Power of The Committee on Interstate and Foreign Commerce, House of Representatives, 90th Cong., 1st Sess. at 2–3 (1967) (quoting H.R. 12435, 90th Cong., 1st Sess., para. (hh)).

8

1961) (wherein the NFL Commissioner acknowledged "absolutely" under oath his understanding that the bill "covers only the free telecasting of professional sports contests, and does not cover pay T.V.").12 As the District Court observed in its well-reasoned opinion, the NFL obtained in the 1961 Act an expressly limited exception to "the normal prohibition on monopolistic behavior"; one which permitted it to sell pooled rights to sponsored telecasters and which expressly did not apply to subscription television. The NFL got what it lobbied for; it cannot now expect the federal courts to transform"narrow, discrete, special-interest" legislation into a far broader exemption. Shaw, 1998 WL 419765, *5.13 This is

_____

12. See also Chicago Pro. Sports Ltd. Partnership v. NBA, 808 F. Supp. 646, 649-50 (N.D. Ill. 1992) (reviewing legislative history and concluding that the SBA's legislative history showed that sponsored telecasting was limited to free commercial television); Letter from Charles F. Rule, Asst. Atty. Gen., Antitrust Division, U.S. Department of Justice, to the Hon. Howard M. Metzenbaum, Chairman, Senate Subcommittee on Antitrust, Monopolies, and Business Rights, March 30, 1988, reprinted in Antitrust Implications of the Recent NFL Television Contract: Hearing Before the Subcommittee on Antitrust, Monopolies, and Business Rights of the Commission on the Judiciary, 100th Cong., 1st Sess. 67 (1987) (citing legislative history and concluding – as did the FTC – that the SBA provides no antitrust immunity to the NFL for its contract with ESPN, a cable operator, as that programming is not within the "sponsored telecasting" exemption).

The NFL argues on appeal that references in the House records to sales to networks and "other potential purchasers" of television rights conflicts with a finding that the exemption was not intended to extend to broadcasts requiring payment by viewers. This is not so. In the context of the 1961 Act, the "other potential purchasers" were quite probably other sponsored (but non-network) purchasers, such as local and regional television stations.

13. See also Chicago Pro. Sports Ltd. Partnership v. NBA, 961 F.2d 667, 671 (7th Cir. 1992), cert. denied, 506 U.S. 954, 113 S. Ct. 409, 121 L.Ed.2d 334 (1992) (holding that it is "inappropriate to extend [special interest laws] to achieve more of the objective the lobbyists wanted") (citations omitted). The Court of Appeals observed that "When special interests claim they have obtained favors from Congress, a court should ask to see the bill of sale." Id.

9

particularly so, once again, because the Act must be narrowly applied.14

IV.

Because we find that the subscription satellite broadcast of NFL games is not a part of the NFL's rights to the sponsored telecasting of those games and therefore not within the Sports Broadcasting Act's exemption to the antitrust laws, we will affirm the District Court's decision.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

14. See supra note 8; see also Chicago Pro. Sports, 961 F.2d at 672 (noting that "courts read exceptions to the antitrust laws narrowly, with beady eyes and green eyeshades") (citations omitted).