The MID–SOUTH GRIZZLIES (a Joint Venture); John Edward Bosacco; Mid-South Grizzlies (a Limited Partnership); and Consolidated Industries, Inc., Appellants

v.

The NATIONAL FOOTBALL LEAGUE, an unincorporated association; Balti-more Football Club, Inc.; Buffalo Bills, Inc.; Chargers Football Company; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; Dallas Cowboys Football Club, Inc.; Detroit Lions, Inc.; Five Smiths, Inc.; Green Bay Packers, Inc.; Houston Oilers, Inc.; Kansas City Chiefs Football Club, Inc.; Los Angeles Rams Football Company; Miami Dolphins, Ltd.; Minnesota Vikings Football Club, Inc.; New England Patriots Football Club, Inc.; New York Football Giants, Inc.; New York Jets Football Club, Inc.; New Orleans Saints Louisiana Partnership; Oakland Raiders, Ltd.; Philadelphia Eagles Football Club, Inc.; Pittsburgh Steelers Sports, Inc.; Pro-Football, Inc.; Rocky Mountain Empire Sports, Inc.; San Francisco Forty Niners; Seattle Professional Football, A General Partnership; St. Louis Football Cardinals Company; Tampa Bay Area NFL Football, Inc. and Pete Rozelle.

No. 82–1793.

United States Court of Appeals, Third Circuit.

Argued Sept. 13, 1983.

Decided Nov. 4, 1983.

Rehearing Denied Dec. 5, 1983.

Richard A. Sprague, Edward H. Rubenstone, Steve Alexander, Sprague & Rubenstone, Philadelphia, Pa., Gary Green (argued), Neil A. Morris, Sidkoff, Pincus, Greenberg & Green, Philadelphia, Pa., for appellants; Louis B. Schwartz, Philadelphia, Pa., of counsel.

Morris L. Weisberg, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., James C. McKay, Paul J. Tagliabue (argued), Covington & Burling, Washington, D.C., for appellees.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Mid-South Grizzlies, a joint venture, and its members (the Grizzlies) appeal from a summary judgment in favor of the defendants in their suit against the National Football League (NFL), the league members, and League Commissioner Pete Rozelle, seeking damages under Section 4 of the Clayton Act, 15 U.S.C. § 15 (1973). The suit concerns the defendants' refusal to grant the plaintiffs a football franchise. On appeal the Grizzlies contend that the district court erred: (1) in granting summary judgment while the Grizzlies' discovery requests were outstanding; and (2) in granting summary judgment when there were disputed issues of material fact.[1] We affirm.

## I.

### Background

The NFL is a not-for-profit business league, qualified for exemption from federal income tax under section 501(c)6 of the Internal Revenue Code, 26 U.S.C. § 501(c)(6) (1967). The league has 28 members, each of which is an entity organized for profit, engaged in the business of fielding a professional football team. The NFL was formed by the merger of two predecessor football leagues. That merger took place following the enactment, in 1966, of Pub.L. 89–800, § 6(b)(1), 80 Stat. 1515, which amended Pub.L. 87–331, § 1, 75 Stat. 732 (1961), 15 U.S.C. § 1291. Section 1291, enacted in 1961, granted to certain professional sports leagues a limited exemption from the antitrust laws with respect to the joint sale of television broadcast rights for league games, and the 1966 amendment permitted "a joint agreement by which the members of two or more football leagues combine their operations in expanded single leagues ... if such agreement increases rather than decreases the number of professional football clubs so operating." The 1961 exemption with respect to joint sale of television broadcasting rights, intended to overrule the judgment in *United States v. National Football League*, 116 F.Supp. 319 (E.D.Pa.1953), does not "otherwise affect the applicability or nonapplicability of the antitrust laws" to any other activities of persons engaged in professional team sports. 15 U.S.C. § 1294. The 1966 exemption does no more than permit the combination of members of two or more leagues into one.

Under the 1974 constitution and by-laws of the NFL each member obliges itself to operate a professional football club which is a member of the league. Each member has a designated "home territory" within which it has "the exclusive right ... to exhibit professional football games played by teams of the League," and "[n]o club in the League shall be permitted to play games within the home territory of any other club unless a home club is a participant." Home territory is defined as a designated city and "the surrounding territory to the extent of 75 miles in every direction from the exterior corporate limits of such city."[2] Constitution and By-Laws, Article IV, Appendix at 1129a, 1138a. The addition of a new league member within the home territory

---

1. The court's decision is reported. *Mid-South Grizzlies v. National Football League,* 550 F.Supp. 558 (E.D.Pa.1982).

2. There are special provisions for the New York and San Francisco Metropolitan areas and for Green Bay, Wisconsin.

of any member requires unanimous consent of the league members. *Id.* Article 3.1(b). Elsewhere, applicants for membership may be admitted by the affirmative vote of not less than three-fourths or 20 members, whichever is greater. *Id.* Article 3.3(c). No league member may have a financial interest, direct or indirect, in any other league member. *Id.,* Article 9.1(B)(1).

The combined league began functioning in 1970 with 26 members. Thereafter new home territories were designated for Tampa, Florida, and Seattle, Washington, and member teams with franchises for those home territories began participating in league play in 1976. The uncontradicted affidavit of Commissioner Rozelle establishes that the initiative for establishing those franchises came from the NFL, which negotiated for a stadium location, determined methods of providing the franchise with players, and only then evaluated and selected owners. *See, e.g.,* Rozelle Deposition, Appendix at 1290a, 1431a–1440a.

As authorized by 15 U.S.C. § 1291, the NFL has made a joint sale to three major television networks of the regular season and post-season television rights. Television revenues are divided equally among all members. Receipts from the sale of tickets are shared between the home team, 60% and the visiting team, 40%. Each home team retains other revenues, derived from its local operations.[3] On average, however, more than 70% of each team's revenue is derived from sources other than its operations at the home location. *See* Defendants' Motion for Summary Judgment, Affidavit of Pete Rozelle, Appendix at 188a.

In 1974 and 1975 the Grizzlies participated in the World Football League from a home team location in Memphis, Tennessee. The members of that league could be found to have been competitors of the members of the NFL in the national market for network television revenue. The World Football League disbanded, however, halfway through the 1975 football season. The NFL had no franchise at Memphis, and a home team designation for that location would not infringe upon the home territory of any NFL member. Upon the demise of the World Football League the Grizzlies applied to the NFL for admission to the league with a designated home territory at Memphis.

At meetings with the NFL Expansion Committee, and with the full NFL membership, the Grizzlies urged that it had in place at Memphis an established, functioning professional football enterprise. The application was rejected. This lawsuit followed.

## II.

### The Complaint

The Grizzlies' complaint, filed on December 3, 1979, does not charge that the provisions of the NFL's Constitution and By-Laws reserving to its members franchise exclusivity for designated home territories violates the antitrust laws. Indeed, the Grizzlies sought such an exclusive franchise for themselves. Thus this case does not present any issue of possible antitrust violation from the exclusion of potential competitors in the designated exclusive home territories.

Nor do the Grizzlies complain that the NFL's 60–40 home team-visitor revenue sharing arrangement, which is not exempted from antitrust scrutiny by 15 U.S.C. § 1291, caused any injury to their business or property. Indeed, the Grizzlies sought to participate in that arrangement. Moreover, the Grizzlies make no complaint about the operation of the NFL arrangements for joint sale of television rights. They do not charge, for example, that the demise of the World Football League was caused by the NFL's television marketing practices. Nor do they charge that if they had been admitted those practices should have been changed. Rather, as with the 60–40 split of ticket sale revenue, they sought to participate.

---

**3.** These include revenue from non-network coverage of pre-season games, and revenue from food and beverage concessions, parking, and sale of team paraphernalia. Such revenue varies both with attendance and depending on the terms of stadium leases.

Determining what the Grizzlies do not charge as antitrust violations is somewhat easier than determining what is charged. The complaint alleges that Memphis is a highly desirable submarket for major league professional football, that the refusal to consider it as a home territory for a franchise was made pursuant to an agreement or understanding or conspiracy among NFL members, the NFL and the Commissioner, that no valid basis for rejection of the Grizzlies was articulated or formulated by the defendants, and that the rejection amounted to an unreasonable restraint of trade, or a group boycott. One motive for that conspiracy is alleged to have been a desire to punish, intimidate and restrain plaintiffs from participation in major league professional football because they had entered into competition with NFL members by participating in the World Football League. The exclusion, so motivated, and having the effects alleged, is said to be a violation of Section 1 of the Sherman Act, and an attempt to monopolize interstate trade and commerce in professional football in violation of Section 2 of that Act.

### III.

### The Summary Judgment Record

The defendants moved for summary judgment on March 2, 1981, supporting their motion with affidavits by Commissioner Pete Rozelle and by Daniel M. Rooney, Chairman of the NFL Expansion Committee, to which defendants attached 12 supporting exhibits. At the time of the motion there was outstanding a motion by the Grizzlies to compel answers to certain interrogatories, and to compel production of documents. In opposition to the summary judgment motion the Grizzlies filed an extensive brief addressing the merits, and the affidavits of William R. Tathan, I.B. Rowe and Steve Alexander, Esq. The Grizzlies contended that the summary judgment motion should not be considered until the completion of discovery.

On August 13, 1981 the trial court filed a memorandum and order declining to consider the motion for summary judgment until the completion of the Grizzlies' discovery, but restricted the scope of discovery to "matters relating to the NFL's decision not to grant the plaintiffs an NFL franchise at Memphis, Tennessee, and to the NFL's prior practices and standards with respect to the admission of new franchises into the league since the merger of the NFL and the American Football League." 4 App. at 894. The Grizzlies were permitted to depose Mr. Rozelle, Mr. Rooney, and the other members of the NFL Expansion Committee, but solely with respect to the designated subject matter. The order fixed a schedule for renewal of the motion for summary judgment, for filing opposition to it, and for briefing. *Id.* at 895.

On September 16, 1981 counsel for the Grizzlies wrote to the trial judge asking for clarification of the discovery order. The court was asked if the order was intended

> to focus the parties' attention ... solely upon the issue of whether fair, objective, and articulated standards were applied by the defendants in passing upon plaintiffs' application for membership in the NFL, whether such standards existed at the time, and whether any substantive consideration, ... was ever given to plaintiffs' application by the defendants.

> If, in fact, it was the Court's intention to focus only on the objective criteria question at this time, and to accept the remaining criteria in the plaintiffs' Complaint as true for the purpose of this motion proceeding, the scope of discovery can be substantially limited without waiving our position, many of the pending discovery requests can be withdrawn, subject to renewal ..., and more specific discovery ... can surely proceed....

Letter of Edward H. Rubenstone, Esq. to Hon. Joseph L. McGlynn, Sept. 16, 1981, 4 App. at 1083–1084. The court replied two days later that "[y]our assumptions concerning the rationale underlying my order dated August 13, 1981 are correct." The court noted the Grizzlies' concession in open court on August 12, 1981 "that under some circumstances, and applying objective, ra-

tional and fair decisional criteria, defendants might legitimately, collectively refuse to deal with a potential competitor demanding entry into the professional football market place." The court explained further:

In an effort to spare all parties the time and expense of what may prove to be unnecessary discovery proceedings, I entered my order of August 13th, which limited discovery "solely to matters relating to the NFL's decision not to grant the plaintiffs an NFL franchise at Memphis, Tennessee, and to the NFL's prior practices and standards with respect to the admission of new franchises into the league since the merger of the NFL and American Football League". If discovery in this discrete area should reveal that the NFL applied objective standards to the plaintiffs' application, there may not be a need to conduct further discovery.

4 App. at 1085. The trial judge also stated his assumption that there was no need to rule on outstanding discovery requests, since counsel's letter stated that he would be able to reach an accord with defense counsel regarding them. He warned, however, that all discovery must be complete by October 31, 1981. *Id.* at 1086. Further correspondence between the parties and the court took place respecting the issues posed by the NFL's motion for summary judgment, and on December 17, 1981 the trial judge by letter reiterated his intention to consider the NFL motion "because if it is undisputed that the defendants used 'objective, rational and fair decisional criteria' in rejecting plaintiff's application, then that may well be the end of the litigation ball game." 4 App. at 1099.

On December 21, 1981 the defendants filed a renewed motion for summary judgment, relying on the pleadings, depositions, answers to interrogatories, admissions on file, and the Rozelle and Rooney affidavits accompanying their initial motion. 4 App. at 901. The brief in support of the renewed motion is not restricted to the question of whether the decision to reject the Grizzlies' application was based on "objective, rational and fair decisional criteria." Rather it relies on the "undisputed facts" in the rec-

ord made to date with respect to the nature of the professional football business, and asserts that those facts warrant summary judgment for defendants as a matter of law. Thus the renewed motion put the Grizzlies on notice that the defendants were relying upon the summary judgment record as then comprised, and of the obligation to set forth in affidavits the reasons why additional discovery would be necessary in order to oppose it. Fed.R.Civ.P. 56(f).

On March 10, 1982 the Grizzlies filed a 107 page brief in opposition to the renewed motion for summary judgment. 4 App. at 963 et seq. That brief is not limited to the question whether the Grizzlies' application was rejected on the basis of objective, rational and fair decisional criteria. It addresses the full range of issues discussed in the defendants' brief in support of the motion. Although the correspondence between counsel and the court was included in an appendix to the Grizzlies' brief, no affidavit was filed setting forth any reason why additional discovery should be afforded before the court ruled on the motion. Nor was that subject addressed in the brief in opposition to the renewed motion. It surfaced, however, in a Grizzlies' brief in response to defendant's reply brief. Responding to the defendants' contention that the members of the NFL are not competitors, but are engaged in a joint venture in the promotion of an entertainment spectacle, the Grizzlies argued:

Nevertheless, despite Defendants' heavy reliance on this argument, the "single entity" issue was *not* the subject of discovery. Indeed, in order to determine whether there is any merit to Defendants' "single entity" contention, the starting point in discovery would be necessarily an examination of the business and financial records of the individual teams. These records would show what part of each team's revenue is not shared by any other team, what activities generated that revenue, and how the revenue was treated on the team's books. Based on these records, Plaintiffs could prove that the teams are not a "single entity."

In addition, other factors of economic competition between the teams would have to be discovered, along with the views of each team about that economic competition. This would entail, (a) a study of the league's operations; (b) an inquiry into the existence of factionalism and voting blocks in league deliberations and at meetings; (c) depositions from representatives of each team; and discovery of a host of other categories of facts which need not be listed here. All of this information would be needed before the Court would have an adequate record on which to make a ruling on Defendants' contentions that the separate teams must be viewed as a single entity for antitrust purposes. It suffices to note that depositions were limited by Court Order to the four members of the 1973 NFL "Expansion Committee", and Pete Rozelle, and that the written discovery was confined to the issue of "objective standards." Perhaps it should be noted as well that before the Court entered its August 31, 1981 Order, Plaintiffs had, in fact, filed discovery requests seeking information which would have shed light on Defendants' "single entity" contention, but Defendants objected to all of this discovery. Therefore, the record does not contain evidence for the Court to rule on Defendants' "single entity" contention.

5 App. at 1217–18. This brief made no reference to specific discovery requests addressed to what the Grizzlies characterize as defendants' "single entity" contention. There is no suggestion that there are sources of revenue other than sales of tickets, sales of television rights, and revenues derived from food and beverage concessions, parking, and sales of team paraphernalia. There is no indication that a professional football business located at Memphis, Tennessee would compete with any NFL member for these peripheral sources of revenue. The Grizzlies do not contend that the league members (or the Grizzlies themselves if they were admitted to the league) compete for rather than share in network television and ticket sale revenues.

The trial court addressed the Grizzlies' unfocused contention that there should be additional discovery, noting:

Plaintiffs have had more than sufficient discovery to fully develop their case. All of the outstanding requests to which defendants have refused to respond are not calculated to lead to relevant evidence necessary to resolving this matter. As a result I find that this case is now ripe for a decision on the merits.

550 F.Supp. at 565.

The Grizzlies contend that this ruling was error, because with additional discovery they could have discovered facts which would suggest the existence of actual or potential competition between their Memphis based team and members of the NFL in some relevant product market.

Where Rule 56(f) affidavits have been filed, setting forth specific reasons why the moving party's affidavits in support of a motion for summary judgment cannot be responded to, and the facts are in the possession of the moving party, we have held that a continuance of the motion for purposes of discovery should be granted almost as a matter of course. *Costlow v. United States,* 552 F.2d 560, 564 (3d Cir.1977); *Ward v. United States,* 471 F.2d 667, 672 (3d Cir.1973). But as Judge Friedman so aptly observed:

It is true that Rule 56(f) also authorizes the court in appropriate cases to refuse to enter summary judgment where the party opposing the motion shows a legitimate basis for his inability to present by affidavit the facts essential to justify his opposition, but to take advantage of this provision he must state by affidavit the reasons for his inability to do so and these reasons must be genuine and convincing to the court rather than merely colorable. It is not enough to rest upon the uncertainty which broods over all human affairs or to pose philosophic doubts regarding the conclusiveness of evidentiary facts. In the world of speculation such doubts have an honored place, but in the daily affairs of mankind and the intense-

ly practical business of litigation they are put aside as conjectural.

*Robin Construction Company v. United States,* 345 F.2d 610, 614 (3d Cir.1965). Judge Friedman's observations are relevant here in two respects. First, the Grizzlies filed no Rule 56(f) affidavit.[4] Second, treating their response to the defendants' reply brief as if it were such an affidavit, it raises no more than a merely colorable claim that actual or potential competition for revenue other than from ticket sales and sales of television rights could be shown between a professional team based in Memphis and the other members of the NFL. Just how speculative the Grizzlies' Rule 56(f) showing was, even assuming that it should be considered absent an affidavit, can be appreciated from the analysis, in the margin, of the outstanding discovery requests, the defendants' objections, and this court's conclusion as to their relevance to the issue of competition.[5]

4. Most courts which have considered the issue agree that filing an affidavit is necessary for the preservation of a Rule 56(f) contention that summary judgment should be delayed pending further discovery. *See, e.g., Gray v. Udevitz,* 656 F.2d 588 (10th Cir.1981); *Thi-Hawaii v. First American Financial Corp.,* 627 F.2d 991 (9th Cir.1980); *Over the Road Drivers v. Transport Insurance Co.,* 637 F.2d 816 (1st Cir.1980); *British Airways Board v. Boeing Company,* 585 F.2d 946 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979); *Altemose Construction Company v. Building and Construction Trades Council of Philadelphia,* 443 F.Supp. 492, 498 (E.D.Pa.1977); *Mayerson v. Washington Mfg. Co.,* 58 F.R.D. 377 (E.D.Pa. 1972). *But see Littlejohn v. Shell Oil Co.,* 483 F.2d 1140, 1146 (5th Cir.1973), *cert. denied,* 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1974) (continuance granted "[o]ut of an abundance of caution and to prevent a possible injustice" despite absence of affidavit); *Murrell v. Bennett,* 615 F.2d 306 (5th Cir.1980) (absence of affidavit excused in prisoner's pro se case).

5.

| Request | Appellees' Objection | Relevance to Competition Issue |
|---|---|---|
| I: #2–4, 6 All documents relating to formal meetings at which appellants' application was discussed. | Beyond scope of issue | Irrelevant to competition issue — only relevant to "objective standards" issue. |
| I: #10 Informal meetings of NFL Expansion Committee and Sub-committee; dates, locations, subjects discussed. | Impossible to produce | Relevant to establishing motive for exclusion, not to competition. |
| I: #8(d) All documents relating to possible transfer of NFL teams. | Irrevelant | Arguably relevant, but extremely broad and cumulative of materials in summary judgment record. |
| II: #5 Identify "specifically provisions in NFL Constitution and By-Laws governing voting procedures for making business decisions." | Contained in by-laws | Provisions are easily identified in summary judgment record. |
| I: 8(m) Identify all documents relating to the World Football League. | Involves enormous amounts of information. Not reasonably calculated to lead to admissible evidence. | Irrelevant to competition issue. Related only to the retaliation claim. |
| II: #3 Identify players and coaches in the WFL who subsequently joined the NFL. | Overly burdensome | Irrelevant to competition issue. Relates to retaliation and objective standards issues. |

Considering the already large record compiled prior to its consideration of the summary judgment record, the absence of a Rule 56(f) affidavit, the irrelevance of most of the pending discovery requests, and the conjectural nature of the Grizzlies' contentions as to the possibility of establishment of actual or potential competition in any arguably relevant market, we conclude that the court did not err in considering the motion for summary judgment on the present record.

## IV.

### The Merits

#### A. *Sherman Act Section 1*

Public Law 89–800 establishes as a matter of law that the merger which produced the NFL from two formerly competing leagues did not violate the antitrust laws. Public Law 87–331 establishes as a matter of law that the members may lawfully pool revenues from the sale of television rights. The parties agree that in other respects a

| Request | Appellees' Objection | Relevance to Competition Issue |
|---|---|---|
| II: #4 State with specificity each administrative and promotional function performed by the NFL. | They are broadly stated in the by-laws. Specific functions are beyond enumeration. | Irrelevant to competition issue. |
| II: #7 State amounts of NFL assessments against individual members and expenditures against which such assessments were applied. | 1) Unduly burdensome. 2) Might lead to disclosure of confidential information. 3) Not reasonably calculated to lead to discovery of admissible evidence. | Irrelevant to competition issue. |
| II: #8(c), (d) Amount of disbursement of expansion fees from 1966 to present; amount of "assets" contributed to new franchises. | 1) Unduly burdensome. 2) No bearing on issues of suit. | Irrelevant to competition issue. |
| II: #29–30 Specify how plaintiffs' expansion into the NFL would diminish the league's joint assets; identify all specific documents. | 1) [General discussion of joint revenue producing assets of NFL: goodwill, League trademarks, etc.] 2) Exact diminution can't be forecast. 3) Documents are confidential, burdensome to produce, not relevant. | Irrelevant to competition issue. |
| III: #1–7 Financial statements and tax returns of each defendant for 1976–1979: all documents revealing terms of operating agreements between defendants and NFL Properties, Inc.; all contracts by defendants or by NFL Properties, Inc. concerning broadcast rights and stadium leases. | 1) Irrelevant. 2) Documents are confidential. Production not justified by any compelling necessity. | Plaintiffs advance five reasons for requesting these documents. *See* Motion to Compel, App. at 125a. Only one of these reasons is relevant: the financial data is relevant to plaintiffs' allegation that the defendants are engaged in conspiratorial, anti-competitive activities. However, the request is otherwise unnecessarily broad, and the information could be obtained in other ways. |

Note 5—Continued

| Request | Appellees' Objection | Relevance to Competition Issue |
|---|---|---|
| II: #6 State with particularity all facts relating to use of voting procedures in context of plaintiffs' application. | Information is in documents relating to plaintiffs' application. | Irrelevant to competition issue. Related to "Objective standards" issue. |
| II: #12 Identify all documents that relate to any interest or concern of defendant in locating or relocating a franchise in Mid-South/Memphis area. | NFL has already produced this. | Relevant, since this would establish element of competition between plaintiff and defendant for geographical market. But all that the plaintiffs ask for in their motion to compel is that the NFL deny the existence of any more documents under oath. This is not likely to lead to material facts. See Motion to Compel, App. at 108a. |
| II: #33 Whether any suits have been filed relating to the Tampa expansion. | Doesn't relate to appellants' application. | Irrelevant to competition issue. Goes to objective criteria question. |
| II: #34 Give all information relating to transfers of ownership interests from 1959 to present. | Beyond scope of suit. | Irrelevant to competition issue. Goes to objective criteria question. |
| IV: #1–9, 15–22 This set includes requests for all recent opinion polls and market surveys for each NFL team, all documents concerning correspondence between a member and a fan, season ticket holder mailing lists for 15 teams, all documents relating to trademark licensing, all documents relating to local broadcast rights, "any document concerning the identification . . . of a statistic regarding to number of players from any given team defendant who played in the Pro-Bowl . . .", etc. | ". . . a 'fishing expedition' of the worst kind. . . . . ." Defendants' Objections to Plaintiffs' Request for Production of Documents Set No. 4 at 3. [Not in appendix]. | There may be documents in this request that would tend to suggest the possibility of competition for the Memphis home team market. However, the request is extraordinarily broad, and no showing was made that anything would be likely to impeach the provision in Art. 9.1(B)(1) of the Constitution and By-Laws of the NFL prohibiting a member club from having a financial interest, directly or indirectly, in any other league member. |
| V: #2, 3, 6, 12, 13 All documents relating to expansion decisions, including all documents relating to designation of Paul Brown as operator of the Cincinnati Bengals. | ———————————— | Irrelevant to competition issue. |

rule of reason analysis is appropriate.[6] The Grizzlies, moreover, make no contention that the 60–40 sharing of ticket sale revenue is an unreasonable restraint of trade.

■ Under a rule of reason analysis a Section 1 violation and a right to recover under Section 4 of the Clayton Act can be established by proof:

(1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; (3) that the objects of and conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

*Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139, 147 (3d Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982), quoting *Martin B. Glauser Dodge Co. v. Chrysler Corp.,* 570 F.2d 72, 81 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). In this case there is no dispute about the requisite concert of action among the defendants. The defendants do deny injury to competition in any relevant market from their rejection of the Grizzlies' application. They urge that any limitations on actual or potential competition in any relevant market were insulated from antitrust scrutiny by the 1961 and 1966 statutes referred to, or, are reasonable as a matter of law. They also urge that as a matter of law there was no competition among league members or between league members and non-members in other markets to which the Grizzlies point.

The Grizzlies identify as the relevant product market major-league professional football, and as the relevant geographic market the United States. The trial court found these markets to be relevant. 550 F.Supp. at 571 n. 33. The court observed as well that "[t]here is no doubt that the NFL currently has a monopoly in the United States in major league football." 550 F.Supp. at 571. The Grizzlies pose as the question on this appeal "whether it can be said as a matter of law that defendants neither acquired nor maintained monopoly power over any relevant market in an unlawful manner." Appellants' Brief at 27.

Note 5—Continued

| Request | Appellees' Objection | Relevance to Competition Issue |
| --- | --- | --- |
| VI: #2(a), (b), (c), 8, 13–15, 24 All minutes and notes of each participant at any meeting concerning expansion, labor unrest, antitrust problems, etc.; all studies of the college draft; all studies of effect of further expansion; all documents "reflecting any TV rating concerning any defendant . . ."; all documents reflecting amount of gate receipts; stadium leases for each defendant between 1972 and 1979. | | Irrelevant to competition issue. |

6. In the complaint the Grizzlies alleged that their exclusion was the result of a group boycott, which was a per se violation of Section 1 of the Sherman Act. The per se violation contention is not made in this court.

As to the acquisition of dominant position and monopoly power, the facts are undisputed. Long before the Grizzlies and the World Football League came into existence, Congress authorized the merger of the two major football leagues extant in 1966, and granted to the merged league the power to pool television revenues. That congressional decision conferred on the NFL the market power which it holds in the market for professional football. Congress could not have been unaware that the necessary effect of the television revenue sharing scheme which it approved for the NFL would be that all members of that league would be strengthened in their ability to bid for the best available playing and coaching personnel, to the potential disadvantage of new entrants.

■ In an effort to bolster its "unlawful acquisition of·monopoly power" contention, however, the Grizzlies point to certain activities of the NFL and its predecessors which occurred prior to the 1966 legislation authorizing its formation. They point out that in 1961, when the old NFL was seeking legislation which would overrule *United States v. National Football League,* 116 F.Supp. 319 (E.D.Pa.1953), which prohibited certain television revenue sharing practices, it admitted a new team in Minnesota, the home state of the Senate Majority Leader and Chairman of the Committee which considered the bill; that in 1966 when the old NFL and AFL leagues were seeking a statutory exemption which would permit their merger, a team was added in New Orleans, the home state of a powerful senator and powerful congressman who supported the legislation. Even the post-merger addition of Seattle and Tampa Bay, according to the Grizzlies, was prompted by a desire to limit the term of proposed legislation prohibiting home teams from blacking out televised games when they were playing. See Pub.L. 93–107, § 1, 87 Stat. 350, repealed by Pub.L. 93–107, § 2, 87 Stat. 351 (1973). If these allegations are true, as we must assume for purposes of a summary judgment motion, they are, perhaps, instructive on the nature of the federal legislative process. For purposes of rule of reason analysis, however, they are irrelevant. It would take a court bolder than this to claim that the congressionally authorized acquisition of market power, even market power amounting to monopoly power, was unlawful under Section 1 of the Sherman Act.

But, the Grizzlies urge, the 1966 statute did not confer the authority to abuse the market power, even though it may have authorized its acquisition. Rather, the merger was approved only "if such agreement increases rather than decreases the number of professional clubs so operating." 15 U.S.C. § 1291. Paraphrasing their argument, it is the Grizzlies' contention that the statute which authorized NFL acquisition of monopoly power in the professional football market required not only that the league members refrain from abusing that power against potential competitors, but that it take affirmative steps to share its market power with others.

This reading of the 1966 legislation is at least plausible. It poses two separate issues. One is the issue of abuse of monopoly power against potential rivals of the NFL in the business of promoting professional football as a spectator spectacle. The other is the issue of admitting others to a share in the NFL's dominant market position. Although the Grizzlies' briefs, both here and in the district court, tend to blur the distinction between those issues, the complaint makes clear that only the second is presented in this case. The only basis on which the Grizzlies seek recovery under Section 4 of the Clayton Act is that they were denied admission to the monopoly, and thus were deprived of a share of the NFL's monopoly power. No claim is made that abuse of NFL market power led to the demise of the

World Football League, and no issue is before us concerning activities of the NFL, since that demise, which may have inhibited the development of competition by another football league. The NFL structure as a barrier to entry to the market by another football league is relevant in this case only to the extent that it bears on the obligation to permit entry to the NFL.[7]

There are two possible sources of any NFL obligation to permit entry to its shared market power; the 1966 statute, and the Sherman Act. Each will be considered separately.

■ The provision in the 1966 statute that "such agreement increases rather than decreases the number of professional football clubs so operating" cannot reasonably be construed as addressing competition, the preservation of which is the object of the Sherman Act. The basic thrust of the 1966 statute is to authorize an arrangement which eliminated competition among the only two viable competitors then in the professional football market. The reference to an increase in the number of professional football teams "so operating" is a reference to professional teams operating under the antitrust exemption for television revenue sharing provided in the 1961 statute. Thus what the 1966 statute suggests is that more home team territories would be added, not to increase competition in professional football, but to permit geographic enlargement of the NFL's market power.

The Grizzlies urge that home team regions derive important economic benefits from the presence of a professional football team, in the form of hotel, restaurant and travel business, stadium employment, and the like. Undoubtedly that is so, and prob-ably such derivative economic benefits were in the minds of those Senators and Congressmen interested in NFL expansion. Those benefits, however, do not result from competition with the NFL or even from competition, other than athletic, among its members. Rather they result from the presence of a franchisee which shares the NFL market power over professional football. Moreover, even if one assumes that Congress intended in the 1966 statute to extend incidental economic benefits on businesses in new home territory areas, it is difficult to see what standing the Grizzlies have to rely on that intent with respect to their claim for league membership. Finally, even if there was a congressional intent to confer economic benefits in some new home territories, nothing in the 1966 statute or its sparse legislative history suggests a basis for concluding that businesses in Memphis, Tennessee, rather than in other metropolitan areas were to receive them.

■ Since the 1966 statute is not directed at preservation of competition in the market for professional football, and cannot be construed as conferring any economic benefit on the class to which the Grizzlies belong, we conclude that it does not oblige the NFL to permit entry by any particular applicant to the NFL shared market power.

We turn, therefore, to the Sherman Act. As noted above, Sherman Act liability requires an injury to competition. In this case the competition inquiry is a narrow one, because the Grizzlies are not seeking recovery as potential competitors *outside* the NFL. They identify as the antitrust violation the league's negative vote on their application for membership.

From affidavits, pleadings, and discovery materials which comprise the summary

---

7. There is no doubt that the NFL structure authorized by the 1961 and 1966 legislation in itself presents a formidable barrier to entry by a competitive football league. That legally countenanced barrier might well, if abused against extra-league competitors, result in antitrust liability. But the issue of competition by another league is not presented here, except to the limited extent noted.

judgment record it could be found, and the trial court assumed, that the Grizzlies met all the qualifications for membership specified in the NFL Constitution and By-Laws. 550 F.Supp. at 568. It is undisputed that in 1974 expansion teams were located at Tampa, Florida, and at Seattle, Washington, raising to 28 the number of league competitors for the 1976 season. It is also undisputed that in deciding on expansion the NFL Expansion Committee considered a socioeconomic study prepared for it by the Stanford Research Institute in December of 1973, which identified fourteen potential locations for new franchises, including Memphis.[8] The Expansion Committee met with representatives of the Grizzlies, but made a negative recommendation on expansion, as of 1975, beyond 28 teams. The full membership of the league accepted the recommendation of the expansion committee.

The NFL's stated reasons for rejecting the Grizzlies' application included scheduling difficulties created by the presence of an odd number of teams, a long-running collective bargaining dispute with league players, several pending antitrust lawsuits, and league concern over legislation prohibiting television blackouts in home team territories, all of which allegedly made consideration of expansion unpropitious. The Grizzlies contend that there are material issues of disputed fact as to the accuracy of these reasons. They contend that at trial they could prove that the motivation for their rejection was to punish them for having attempted in the past to compete with the NFL in the World Football League, or to reserve the Memphis location for friends of present league team owners.

■ Assuming, without deciding, that the summary judgment record presents dis-

puted fact issues with respect to the actual motivation of the NFL members, those disputed facts are not material, under Section 1 of the Sherman Act, if the action complained of produced no injury to competition.

As to competition with NFL members in the professional football market, including the market for sale of television rights, the exclusion was patently pro-competitive, since it left the Memphis area, with a large stadium and a significant metropolitan area population, available as a site for another league's franchise, and it left the Grizzlies' organization as a potential competitor in such a league. If there was any injury to competition, actual or potential, therefore, it must have been to intra-league competition.

The NFL defendants' position is that the summary judgment record establishes conclusively the absence of competition, actual or potential, among league members. Rather, they urge, the league is a single entity, a joint venture in the presentation of the professional football spectacle.

For the most part the congressionally authorized arrangements under which the NFL functions eliminate competition among the league members. Indeed it is undisputed that on average more than 70% of each member club's revenue is shared revenue derived from sources other than operations at its home location. The Grizzlies do not challenge the legality of the NFL's revenue sharing arrangements, and seek to participate in them. The Grizzlies emphasize that there nevertheless remains a not insignificant amount of intra-league non-athletic competition. We need not, in order to affirm the summary judgment, accept entirely the NFL's position that

---

8. The other areas are Mexico City, Birmingham, Alabama, Seattle, Washington, Nassau County, New York, Anaheim, California, Chicago, Illinois, Phoenix, Arizona, Honolulu, Hawaii, Tampa, Florida, the Tidewater area of Virginia, Charlotte-Greensboro, North Carolina, Indianapolis, Indiana, and Orlando, Florida.

there is no intra-league competition. Conceivably within certain geographic sub-markets two league members compete with one another for ticket buyers, for local broadcast revenue, and for sale of the concession items like food and beverages and team paraphernalia.[9] Thus rejection of a franchise application in the New York metropolitan area, for example, might require a different antitrust analysis than is suggested by this record. But the Grizzlies were obliged, when faced with the NFL denial of the existence of competition among NFL members and a potential franchisee at Memphis, to show some more than minimal level of potential competition, in the product markets in which league members might compete. They made no such showing. The record establishes that the NFL franchise nearest to Memphis is at St. Louis, Mo., over 280 miles away. There is no record evidence that professional football teams located in Memphis and in St. Louis would compete for the same ticket purchasers, for the same local broadcast outlets, in the sale of team paraphernalia, or in any other manner.

The Grizzlies contend on appeal, although they did not so contend in the trial court, that league members compete in what they call the "raw material market" for players and coaching personnel. Entirely apart from the propriety of considering a legal theory not presented in the trial court,[10] there are major defects in this Grizzlies' argument. First, the Grizzlies exclusion from the league in no way restrained them from competing for players by forming a competitive league. Second, they fail to explain how, if their exclusion from the league reduced competition for team personnel, that reduction caused an injury to the Grizzlies' business or property. See *Van Dyk Research Corp. v. Zerox Corp.*, 631 F.2d 251, 255 (3d Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). (Section 4 plaintiff has burden of proving that injury was caused by illegality relied on).

One final Grizzlies' argument in support of their section 1 Sherman Act claim bears mentioning. Relying on the essential facilities doctrine developed in cases such as *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), and *Gamco, Inc. v. Providence Fruit & Produce Bldg.*, 194 F.2d 484 (1st Cir.), *cert. denied*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952), they urge that because the NFL is a practical monopoly it had an obligation to admit members on fair, reasonable, and equal terms, absent some procompetitive justification for their exclusion. This Grizzlies argument suffers from the same defect as the others. The essential facilities doctrine is predicated on the assumption that admission of the excluded applicant would result in additional competition, in an economic rather than athletic sense. The Grizzlies have simply failed to show how competition in any arguably relevant market would be improved if they were given a share of the NFL's monopoly power.

Since on the record before us the Grizzlies have shown no actual or potential injury to competition resulting from the rejection of their application for an NFL franchise, they cannot succeed on their section 1 Sherman Act claim.

---

9. Thus we need not, in order to affirm, approve the suggestion in *Levin v. National Basketball Ass'n*, 385 F.Supp. 149, 152 (S.D.N.Y.1974), that there can never be competition among league members.

10. *See Halderman v. Pennhurst State School & Hospital*, 673 F.2d 628, 639 (3d Cir.) (in banc), *cert. granted*, 457 U.S. 1131, 102 S.Ct. 2956, 73 L.Ed.2d 1348 (1982); *Caisson Corp. v. Ingersoll Rand Co.*, 622 F.2d 672, 680 (3d Cir.1980); *Teen-Ed, Inc. v. Kimball International, Inc.*, 620 F.2d 399, 401 (3d Cir.1980); *Toyota Industrial Trucks U.S.A., Inc. v. Citizens Nat'l Bank of Evans City*, 611 F.2d 465 (3d Cir.1979).

**B.** *Sherman Act Section 2.*

The Grizzlies also plead a violation of section 2 of the Sherman Act. 15 U.S.C. § 2 (1973). That section prohibits attempts to monopolize. In section 2 cases the alleged monopolist is prohibited from acting "in an unreasonably exclusionary manner vis-a-vis rivals or potential rivals...." *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 853 (6th Cir.1979). *See also Official Airline Guides, Inc. v. FTC,* 630 F.2d 920, 926–28 (2d Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981) (Federal Trade Commission Act § 5 claim); *Mid Texas Communications v. American Telephone & Telegraph Co.,* 615 F.2d 1372, 1387 (5th Cir.1980), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1981).

■ Our analysis of the section 1 Sherman Act claim applies equally to the Grizzlies' section 2 claim. Congress by legislation in 1961 and 1966 authorized the NFL acquisition of the market power which it holds, and the Grizzlies cannot challenge that acquisition. The only action they complain of is their exclusion from the shared monopoly, but they have failed to show that their admission would be contra-competitive in any way. Indeed the Memphis home team market has been left by the NFL for potential competitors. Thus on this record summary judgment on the section 2 Sherman Act claim was also proper.

# V.

## Conclusion

The court did not err in considering the defendants' summary judgment motion on the present record. There are no disputed fact issues material to the legal issues presented. The trial court did not err in applying the Sherman Act. Thus the judgment appealed from will be affirmed.