BASEBALL AT TROTWOOD,
LLC, et al., Plaintiffs,

v.

DAYTON PROFESSIONAL
BASEBALL CLUB, LLC,
et al., Defendant.

No. C–3–98–260.

United States District Court,
S.D. Ohio,
Western Division.

March 24, 1999.

Anne Marie Frayne, Jacob Alfred Myers, Myers & Frayne Co., LPA, Dayton, OH, Tina Fletcher Woods, Dyer Garofalo Mann & Schultz, Dayton, OH, for plaintiffs.

Kevin Lee Lennen, John Hayes Rion, John H. Rion and Associates, Dayton, OH, Peter L Steinman, Dothan, AL, Jose Manuel Lopez, Lopez, Beitzel & Severt Co. LPA, Troy, OH, Kevin D. O'Rear, Thomas J. Brunner, Paul J. Peralta, Baker & Daniels, South Bend, IN, for Dayton Professional Baseball, Club, LLC, defendant.

Jose Manuel Lopez, Kevin D. O'Rear, Lopez, Beitzel & Severt Co. LPA, Troy, OH, Kevin D. O'Rear, Thoms J. Brunner, Paul J. Peralta, Baker & Daniels, South Bend, IN, for Sherrie Nmi Myers, Tom Dickson, defendants.

Neil Frank Freund, Wayne Everett Waite, Freund Freeze & Arnold, Dayton, OH, for Dayton, City of, defendant.

Michael Wesley Hawkins, Dinsmore & Shohl, Cincinnati, OH, Laura Goehring Harrelson, Erin A. Starkey, Dinsmore & Shohl LLP, Dayton, OH, for Downtown Dayton Partnership, defendant.

Douglas Edward Hart, Richard Michael Goehler, Frost & Jacobs, Cincinnati, OH, Thomas B. Allen, Frost & Jacobs, Middletown, OH, for National Association of Professional Baseball Leagues, Inc., defendant.

David Michael Rickert, Teresa D. Jones, Thompson, Hine & Flory, Dayton, OH, Barry M. Block, Thompson, Hine & Flory, Dayton, OH, for Midwest League, Beloit Professional Baseball Association, Inc., Burlington Baseball Association, Inc., Cedar Rapids Baseball Club, Inc., Clinton Baseball Club, Inc., United Sports Ventur, President, United Sports Ventures Inc., Cougars Baseball Partners, Take Me Out To The Ball Game, LLC, Peoria Chiefs Community Baseball Club, LLC, Quad City Professional Baseball Club, Inc., The Chicago Tribune Company, Palisades Baseball, Ltd., West Michigan Partnership, Appleton Baseball Club, Inc., defendants.

Stephen Allison Bailey, Robert Carroll Martin, Martin Bailey & MacDonald, Cincinnati, OH, for Cincinnati Reds, Marge Schott, defendants.

## DECISION AND ENTRY SUSTAINING MOTION TO DISMISS OF DEFENDANTS HANK STICKNEY, KEN STICKNEY, MANDALAY SPORTS ENTERTAINMENT, LLC, AND MSE DAYTON BASEBALL, LLC (DOC. # 15)

RICE, Chief Judge.

This litigation arises out of competing efforts to bring minor league baseball to the greater Dayton, Ohio, area ("Dayton area").[1] The Plaintiffs, Baseball at Trotwood, LLC ("BAT"), Rock Newman, Inc. ("RNI"), and Sports Spectrum, Inc. ("SSI"),[2] bring this litigation, alleging, *inter alia*, that their attempt to become the successful competitor in that endeavor was thwarted by the Defendants' alleged concerted activity, in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The Plaintiffs allege that, although they had an agreement to purchase the Michigan Battle Cats, a team in the Midwest League, they were unable to move that team to the Dayton area, because they could not secure the requisite approval from Defendant Midwest League or Defendant National Association of Professional Baseball Leagues, Inc. ("NAPBL").[3]

The Dayton area has long been one of the most sought after markets in the United States in which to locate a minor league baseball franchise. Such a franchise could be located in this area by purchasing an existing franchise and moving it to the area. Anyone wishing to purchase a Midwest League franchise would initially be required to obtain approval from that League, by filing a Control Interest Transfer Application ("CIT"). If the Midwest League approved the CIT, the prospective purchaser would then have to obtain approval from the NAPBL and Major League Baseball ("MLB"). Having secured all three levels of approval to purchase the franchise, the purchaser would then have to file an Application for Relocation ("AFR") with the Midwest League and, if the League gave its blessing, the approval process with the NAPBL and MLB would need to be repeated. In addition, since the Dayton area is within the protected territory of Defendant Cincinnati Reds ("Reds"), the purchaser who wished to transfer a franchise to that area would also be required to obtain a territorial waiver from that entity.

In or before November, 1996, SSI became interested in purchasing a minor league baseball franchise and moving it to the Dayton area.[4] In November, 1996, John Allen ("Allen"), the Reds' Managing Executive, advised SSI that the Reds would only address a waiver of the Reds' territorial exclusivity, when approached by a group that owned either a minor league team or the rights to such a team, which it wanted to move to the Dayton area. In early January, 1997, SSI executed an option agreement with the owner of the Michigan Battle Cats, under which it acquired the right to purchase that franchise

---

1. In their Amended Complaint, the Plaintiffs define the Dayton area as Montgomery and Greene Counties. *See* Doc. # 3 at ¶ 47.

2. BAT is owned by RNI and Richard Ehrenreich, Matt Perry, Christopher Grant and Paul Norman. Those four individuals are owners, officers and/or employees of SSI.

3. Since this case is before the Court on a motion to dismiss, the Court derives its recitation of the facts and circumstances giving rise to this litigation from the allegations contained in the Plaintiffs' 168–paragraph, 45–

page Amended Complaint (Doc. # 3), construing those allegations in the manner most favorable to the Plaintiffs.

4. The Plaintiffs do not allege when SSI became interested in locating a minor league franchise in the Dayton area. However, they do allege that, in November, 1996, SSI had discussions with officials of the Reds, concerning a waiver of the Reds territorial exclusivity. Therefore, the Court surmises that SSI developed its interest sometime either before or during that month.

for the sum of $3,000,000.[5] Thereafter, officials of SSI met again with Allen, and were told that, if the Reds were to waive its territorial rights, SSI would be the exclusive group to locate a minor league baseball franchise in the Dayton area. In reliance upon the assurance given by Allen, SSI, on March 7, 1997, executed a memorandum of understanding with Hara Complex, Inc. ("Hara"), whereby Hara would complete a stadium project by April, 1999. In addition, SSI executed a contract to purchase the Michigan Battle Cats on March 21, 1997.[6] In April, 1997, SSI expanded the base of prospective owners of the Michigan Battle Cats by agreeing to sell a 55% interest in that team to RNI, for $2,000,000, on the condition that permission to relocate that franchise to the Dayton area was obtained.[7]

Given the lucrative nature of the Dayton area, the Plaintiffs, not surprisingly, were not the only group interested in transferring a minor league franchise there. On March 28, 1997, Defendants Sherrie Myers ("Myers") and Tom Dickson ("Dickson") reached a memorandum of understanding with Defendant Downtown Dayton Partnership ("DDP"), to locate a minor league baseball franchise in the Dayton area.[8] Subsequently, the City Commission of Defendant City of Dayton ("Dayton") voted 4– 1 to approve that memorandum of understanding, which stated that the minor league franchise to be located in the Dayton area would be owned or managed by Myers and/or Dickson and that the parties would enter into a lease agreement with Dayton.

In April, 1997, officials of SSI had dinner with Allen. During that dinner, Allen confirmed that he had previously agreed that it would have the exclusive right to transfer a team to the Dayton area, if the Reds were to waive its territorial exclusivity. Nevertheless, on May 30, 1997, Allen issued a conditional territorial exclusivity waiver in favor of DDP. Thereafter, Myers contracted to purchase the Rockford Cubbies from Defendant Chicago Tribune, Inc.[9] Myers then filed a CIT and AFR with the Midwest League, requesting approval to purchase that franchise and to move it to the Dayton area.[10] On August 12, 1997, the Midwest League approved both the CIT and AFR, an action which was followed by similar approval of both by the NAPBL, in September, 1997. Myers was not, however, able to surmount the last hurdle, when MLB withheld its blessings. On September 26, 1997, the Reds terminated the conditional waiver of territorial exclusivity that it had granted to the DDP. In November, 1997, Myers publicly announced that she was terminating her efforts to purchase the Rockford Cub-

---

5. SSI was required to deposit $495,000, which was refundable if a sale did not occur.

6. Under that contract, SSI was to pay $3,000,000 for that franchise. In addition, half of the $495,000 deposit that SSI had made when it entered into the option agreement became non-refundable.

7. The Plaintiffs allege that the agreement was with Rock Newman, rather than RNI, the corporation of which he was the sole shareholder. Given that RNI, rather than its owner, is a Plaintiff in this litigation, the Court assumes for present purposes that RNI acquired the right to purchase 55% of the Michigan Battle Cats. If that entity did not acquire that right, it would be difficult to discern why it is a Plaintiff and how it has been harmed by the allegedly illegal actions of the Defendants.

8. Myers and Dickson are married. Dickson is a member of the Board of Directors of the Midwest League and the principal owner of the Lansing Lugnuts, a team in that league.

9. In their Amended Complaint, the Plaintiffs upon occasion allege that Myers was acting through Defendant Dayton Professional Baseball Club, LLC ("DPBC"), while in other instances, they merely assert that Myers herself acted. For purposes of convenience, the Court will treat Myers and DPBC as one and use Myers to describe both.

10. The Plaintiffs allege that Myers filed both a CIT and an AFR on or about July 31, 1997, despite the fact that earlier in their Amended Complaint the Plaintiffs allege that the two types of approval are normally sought in sequential fashion.

bies and to move that franchise to the Dayton area and that she intended to sue MLB for reverse discrimination.

On or about November 11, 1997, the Reds granted a waiver of its territorial exclusivity to SSI. That waiver would, in accordance with its terms, expire on January 26, 1998. Based upon Myers' public announcement, the Plaintiffs believed that the field had been cleared of opposing teams. Accordingly, they met with officials of Dayton and the DDP, who represented that Myers had withdrawn from the proposal to locate a minor league baseball team in the Dayton area. Thereafter, the Plaintiffs continued with their plans to move the Michigan Battle Cats to the area. Their efforts to have that team play at a stadium to be built in the Downtown area were thwarted, when they were informed by Dayton and the DDP that a significantly greater financial contribution would be expected from the Plaintiffs than that to which Dayton and the DDP had agreed with Myers. In addition, officials of the DDP and Dayton informed the Plaintiffs that they did not want Rock Newman involved in minor league baseball in Dayton. With the possibility of a Downtown Dayton stadium removed, the Plaintiffs once again turned to Hara and finalized an agreement to locate a stadium in Trotwood, Ohio. The Plaintiffs incurred significant expenses to design a stadium and to prepare an offering circular and investor package, as well as a CIT and an AFR.

While all of this was occurring and during the period in which SSI had been granted an exclusive waiver of the Reds' territorial rights, another player appeared on the field. Although the DDP and Dayton had informed the Plaintiffs that Myers had left the game, those two Defendants began to negotiate with Defendants Hank Stickney, Ken Stickney, Mandalay Sports Entertainment, LLC, and MSE Dayton Baseball, LLC (collectively "Mandalay Defendants"), concerning the possibility of locating a minor league baseball team in Downtown Dayton. The Mandalay Defendants also negotiated with Myers about purchasing her interest in the Rockford Cubbies. On January 14, 1998, the Plaintiffs filed a CIT and an AFR with the Midwest League and the NAPBL, seeking permission to purchase the Michigan Battle Cats and to move that franchise to the Dayton area. Both the Midwest League and the NAPBL refused even to review those applications, because the CIT and AFR filed by Myers had not been withdrawn. At the time the Midwest League and the NAPBL refused to review Plaintiffs' applications, Dickson was a member of that League's Board of Directors, and Hank Stickney was a Trustee of the NAPBL. In addition, Myers refused to withdraw the CIT and AFR that she had previously filed. As a result, the Plaintiffs' period of exclusivity expired, before they were able to secure permission to purchase the Michigan Battle Cats and to move that franchise to the Dayton area. As a consequence, the Mandalay Defendants, who ultimately secured the necessary approvals and waiver, rather than the Plaintiffs, will bring minor league baseball to the Dayton area.

The Plaintiffs bring this action against the Mandalay Defendants, Myers, DPBC, Dickson, the Reds, Marge Schott, the NAPBL, the Midwest League, the owners of the teams in that league, Dayton and the DDP. The Plaintiffs allege, *inter alia*, that the Defendants (other than Dayton and the DDP) conspired and acted in concert to restrain trade and to create a monopoly, in violation of §§ 1 and 2 of the Sherman Act (Count I).[11] In addition, the

---

11. The Plaintiffs set forth claims under 42 U.S.C. §§ 1981 and 1985, against Dayton and the DDP, alleging that they acted in concert with other Defendants to prevent the Plaintiffs from acquiring the Michigan Battle Cats and moving that franchise to the Dayton area, because Rock Newman, the owner of SSI, is an African–American. In addition, the Plaintiffs seek to recover from Dayton and the DDP, alleging that they tortiously interfered with existing and prospective business and contractual relationships, engaged in a civil

Plaintiffs allege that those same Defendants violated the Valentine Act, Ohio's antitrust statutes, Chapter 1331 of the Ohio Revised Code (Count II).[12] The Plaintiffs allege that the actions of those Defendants have caused them to suffer damages of at least $60,000,000.

This case is now before the Court on the Motion to Dismiss of the Mandalay Defendants (Doc. # 15), filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As a means of analysis, the Court will initially set forth the standards which are applicable to all motions to dismiss for failure to state a claim upon which relief can be granted, filed pursuant to Rule 12(b)(6), following which it will turn to the arguments of the parties concerning the instant such motion.

In *In re DeLorean Motor Co.*, 991 F.2d 1236 (6th Cir.1993), the Sixth Circuit restated the standards which govern motions to dismiss for failure to state a claim upon which relief can be granted, under Rule 12(b)(6) of the Federal Rules of Civil Procedure:

> We review dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on a *de novo* basis. *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1039–40 (6th Cir.1991). This Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 475 (6th Cir.), *cert. denied*, 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990). A complaint need only give "fair notice of what the plaintiff's claim is and the grounds upon

which it rests." *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir.1990) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A judge may not grant a Fed.R.Civ.P. 12(b)(6) motion to dismiss based on a disbelief of a complaint's factual allegations. *Id.* While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988). "In practice, 'a ... complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.' " *Id.* (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985) (quoting *In re Plywood Antitrust Litigation*, 655 F.2d 627, 641 (5th Cir.1981))).

*Id.* at 1239–40. *See also, Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Mertik v. Blalock*, 983 F.2d 1353, 1356 (6th Cir.1993).

With their motion, the Mandalay Defendants request that the Court dismiss Counts I and II of the Plaintiffs' Amended Complaint, wherein the Plaintiffs allege that all Defendants, except Dayton and the DDP, conspired and acted in concert to restrain trade and to create a monopoly, in violation of §§ 1 and 2 of the Sherman Act and the Valentine Act.[13] In particular, the Plaintiffs allege in those Counts that the actions of those Defendants have placed direct and indirect restraints on the purchase, sale, transfer and relocation of minor league baseball teams and on competition for the purchase, sale, transfer and relocation of such teams. Doc. # 3 at

---

conspiracy and made statements upon which the Plaintiffs detrimentally relied.

**12.** As indicated, the Plaintiffs also set forth claims under 42 U.S.C. §§ 1981 and 1985. In addition, claims under the common law of Ohio are plead. Since those claims are not implicated by the Mandalay Defendants' Mo-

tion to Dismiss, the Court does not describe them further.

**13.** The Mandalay Defendants are also named in a number of the Plaintiffs' other claims; however, the Motion to Dismiss is directed solely at Counts 1 and 2 of the Amended Complaint.

¶ 102. According to the Plaintiffs, the Defendants' actions, by which they accomplished this unlawful restraint on trade, relate to events that occurred during the period after which the Plaintiffs had obtained the exclusive territorial waiver from the Reds. For instance, during that period, the Reds, the Midwest League, the NAPBL and the owners of the teams in the Midwest League negotiated with Myers, Dickson, the Mandalay Defendants and Dayton, despite knowing that the Plaintiffs had obtained the exclusive waiver. In addition, the Midwest League and the NAPBL refused to act on Plaintiffs' CIT and AFR during that period. Finally, Myers and the Chicago Tribune refused to withdraw the CIT and AFR for the Rockford Cubbies, despite the fact that Myers had publicly announced that she had terminated her efforts to purchase a franchise and to move it to the Dayton area. All of these actions prevented the Plaintiffs from purchasing the Michigan Battle Cats and moving them to Dayton, thus preventing them from profiting from their efforts to bring minor league baseball to the area, while assuring that Myers did not suffer a loss.[14]

The Mandalay Defendants initially argue that the Court must dismiss those claims, because the Plaintiffs have failed to allege that they suffered an antitrust injury.[15] In *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court first recognized the requirement that a private party bringing an action for treble damages for violations of federal antitrust laws must have suffered an antitrust injury. The *Brunswick* Court reiterated that antitrust laws protect competition and not competitors and wrote that antitrust plaintiffs:

> must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Id.* at 489, 97 S.Ct. 690.[16] In *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), the Supreme Court explained that "injury, although casually related to an antitrust violation," nevertheless will not qualify as "antitrust injury," unless it is attributable to an anticompetitive aspect of the practice under scrutiny, since it is inimical to the [antitrust] laws to award damages for losses stemming from continued competition." *Id.* at 334, 110 S.Ct. 1884 (citations and internal quotation marks omitted).[17] In addition, Ohio courts

14. In their Memorandum in Opposition (Doc. # 32), the Plaintiffs also argue that competition between Trotwood and Dayton for a team and for a tenant for their respective stadia was restrained by the actions of the Defendants. Since the Plaintiffs have not included such allegations in their Amended Complaint, nor have they sought leave so to amend, the Court does not consider claims based upon such a theory to be part of this litigation.

15. The Mandalay Defendants do not argue that the Plaintiffs' Sherman Act claim must be dismissed by virtue of the exemption from federal antitrust laws that baseball enjoys. *See Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953); *Federal Baseball Club of* *Baltimore v. National League of Professional Baseball Clubs*, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). Therefore, the Court does not address that issue.

16. In *Brunswick*, the plaintiff had alleged that the defendant had violated § 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits anticompetitive mergers, by purchasing a bowling alley with which the plaintiff was in competition and which would have gone out of business if the defendant had not purchased it. Since the defendant's transaction fostered rather than restrained competition, the Supreme Court concluded that the plaintiff had not, as a result, suffered an antitrust injury.

17. In *Atlantic Richfield*, the plaintiff, an independent retailer of gasoline, alleged that de-

have held that a plaintiff must allege an antitrust injury in order to maintain an action under the Valentine Act and have applied the jurisprudence developed by the Supreme Court in *Brunswick* and *Atlantic Richfield* to ascertain whether the plaintiff has suffered such an injury. *See Lee v. United Church Homes, Inc.,* 115 Ohio App.3d 705, 686 N.E.2d 288 (1996); *Schweizer v. Riverside Methodist Hospitals,* 108 Ohio App.3d 539, 671 N.E.2d 312 (1996).

In *Valley Products v. Landmark,* 128 F.3d 398, 403 (6th Cir.1997), the Sixth Circuit recently reviewed its jurisprudence relating to the antitrust injury doctrine:

> The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation.

In *Axis, S.p.A. v. Micafil, Inc.,* 870 F.2d 1105 (6th Cir.), *cert. denied,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989), this court dealt with a situation where the plaintiff, a European manufacturer of armature winding machines, hoped to get into the business of manufacturing such machines in the United States. The plaintiff found itself foreclosed from entering the U.S. market after the defendant, an American subsidiary of a European competitor, obtained key patents from one American manufacturer and took over a second American manufacturer, a company holding a license to use the patents. Although the defendant's takeover of the latter company was assumed to violate § 1 of the Sherman Act and § 7 of the Clayton Act, our court did not view the antitrust violation as having inflicted the requisite antitrust injury. The harm of which the plaintiff complained, as the *Axis* panel saw it, was a direct result of the plaintiff's inability to obtain the patents, or a license to use the patents—and this harm did not "flow from" the element of the takeover that created the antitrust problem. *Id.* at 1112, quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690.

The plaintiff in *Axis* never became a competitor in the American market, and the panel observed by way of dictum that perhaps a competitor could have stated a claim for damages. *Axis,* 870 F.2d at 1111–12. But the plaintiffs in *Hodges v. WSM, Inc.,* 26 F.3d 36 (6th Cir.1994), appear to have been in competition with two of the defendants in that case (Grand Ole Opry Tours and Opryland USA) for a short time prior to the advent of an allegedly illegal market-sharing agreement in the Nashville sightseeing tour and airport shuttle market. We nonetheless held in *Hodges* that the plaintiff shuttle operators could not claim antitrust injury when denied permission to drive their vans past the gates of the defendants' Opryland complex.

> "It was Opryland's refusal to allow Plaintiff's vans on its property which caused Plaintiff's injury. If Plaintiff would have suffered the same injury without regard to the allegedly anticompetitive acts of Defendants, Plaintiff has not suffered an antitrust inju-

---

fendant, an integrated marketer of petroleum products, had violated § 1 of the Sherman Act, by engaging in a vertical conspiracy with its dealers to set maximum retail prices for gasoline above the predatory level. ("Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)). Since the alleged conspiracy fostered competition by reducing the price of gasoline to consumers (the defendant was alleged to have conspired with its dealers to set a maximum price for gasoline, i.e., a ceiling or price above which its dealers were not permitted to charge consumers, which had caused the plaintiff to reduce the price that it charged consumers, thus injuring the plaintiff by preventing it from charging higher prices), the Supreme Court concluded that the plaintiff had not suffered an antitrust injury.

ry." *Id.* at 38 (quoting district court opinion).

In other words, as the *Hodges* panel put it, a violation of the antitrust laws was not a "necessary predicate" to the plaintiffs' loss of business:

> "Because plaintiffs did not allege, nor could they, that the illegal antitrust conduct was a necessary predicate to their injury or that defendants could exclude plaintiffs only by engaging in the antitrust violation, it was appropriate to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Id.* at 39.

*Id.* at 403–04. In *Valley Products,* the plaintiff was engaged in the business of manufacturing and selling guest amenities, such as soap, to hotels. The soap and other amenities were packaged in wrappers that bore the trademark of the hotel chain, of which the purchaser was a part. After the defendant, which owned the trademarks to a number of hotel chains, terminated the license under which the plaintiff had been permitted to use those trademarks on the products that it manufactured and sold, the plaintiff brought suit, alleging that the defendant had violated the Sherman Act. The Sixth Circuit affirmed the decision of the District Court to dismiss the plaintiff's claim under the Sherman Act, since the harm it had suffered flowed from the defendant's decision to terminate the license, rather than from any violation of the Sherman Act and, therefore, the alleged antitrust violation was not a necessary predicate of the plaintiff's loss.

In order to fully analyze the question of whether the Plaintiffs have alleged an antitrust injury, it is helpful to set out some of the parameters of their claims under the Sherman and Valentine Acts. *First,* the Plaintiffs' antitrust claims are not predicated upon the theory that the Defendants violated the Sherman and Valentine Acts, because only one minor league baseball franchise has been permitted to locate within the Dayton area. In other words, the Plaintiffs do not contend that competition in the market for minor league baseball in the Dayton area has been restrained because only one such team (as opposed to two or more) has been permitted to move to that location. Indeed, there is no allegation that the winner of the competition to place a minor league baseball franchise in the Dayton area would be anything but a monopolist. Thus, the Plaintiffs' claims are based upon the theory that the Defendants violated the Sherman and Valentine Acts by permitting the Mandalay Defendants to become that monopolist, rather than themselves. *Second,* there is the question of with whom the Plaintiffs were competing. The Plaintiffs sought to purchase the Michigan Battle Cats and to move them to the Dayton area. If their efforts had been successful, they would have joined the Midwest League. The Plaintiffs do not allege that, once they were permitted to join that league, they would have competed (in the economic rather than athletic sense) with any of the Defendants. Rather, the only competition in which the Plaintiffs have engaged is that with Myers initially and then with the Mandalay Defendants, over the issue of which group would win approval to purchase and to move a franchise to the Dayton area.

The Mandalay Defendants rely upon *Levin v. National Basketball Assn.,* 385 F.Supp. 149 (S.D.N.Y.1974). Therein, the plaintiffs alleged that the defendants had violated the Sherman Act by failing to approve their purchase of the Boston Celtics. The court entered summary judgment for the defendants, concluding that the plaintiffs had not demonstrated harm to competition, since they were attempting to join the league rather than to compete with it. Other courts also have held that a professional sports league and its member teams do not violate antitrust laws by declining to admit a prospective new member, since the applicant is seeking to join the league rather than to engage it in economic competition. *Seattle Totems*

Hockey Club v. National Hockey League, 783 F.2d 1347 (9th Cir.1986); *Mid–South Grizzlies v. National Football League,* 720 F.2d 772 (3rd Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984). Herein, the Plaintiffs were seeking to join the Midwest League, rather than to compete in the economic sense with that League, the owners of its teams or the NAPBL. However, the Plaintiffs argue that the instant litigation is distinguishable from those cases, since they have alleged that they were in competition initially with Myers and then with the Mandalay Defendants over the right to move a franchise to the Dayton area. Furthermore, the Plaintiffs contend that they lost that competition, because the Defendants conspired and acted in concert to prevent their CIT and AFR from even being considered by the Midwest League and the NAPBL. Unlike this litigation, *Levin, Seattle Totems* and *Mid–South Grizzlies* did not arise out of competition between groups seeking to purchase and to move a sports franchise to another city; rather, in *Seattle Totems* and *Mid–South Grizzlies,* the plaintiffs sought expansion franchises, while the plaintiffs in *Levin* were the only group seeking to purchase the Boston Celtics. Although the Court agrees with the Plaintiffs that there are factual differences between this litigation and those cases, this Court deems those differences to be without legal significance. Even though the Plaintiffs were competing with another group, over which would be allowed to purchase a minor league franchise and move it to the Dayton area, they were nevertheless seeking to join the Midwest League and the NAPBL, rather to compete (in the economic sense) with the teams in that League and the NAPBL. Although the actions of the Defendants may have harmed one of the competitors in that endeavor, those actions, while they may constitute business torts, did not harm economic competition, insofar as the consumer is concerned, since they did not prevent the Plaintiffs from being one of two or more groups presenting minor league baseball in the Dayton market. On the contrary, based upon the allegations in the Amended Complaint, it seems always to have been understood that Dayton would have but one minor league team, the issue being, of course, which group would have the ownership interest in that team. Therefore, just as the plaintiffs in *Levin, Seattle Totems* and *Mid–South Grizzlies* did not suffer antitrust injuries, when they were refused admission to the respective professional sports leagues, since economic competition between members of those leagues was not reduced as a result, the Plaintiffs have not alleged that they have suffered an antitrust injury, since a reduction of competition, in the economic sense in the relevant market, will not flow from the decision to permit the Mandalay Defendants rather than themselves to be the group permitted to purchase a minor league baseball franchise and to move it to this area.

Moreover, even if the Plaintiffs' allegations were sufficient to make this litigation legally distinguishable from those cases, the Court would nevertheless conclude that the Plaintiffs had not alleged an antitrust injury. Rather, their antitrust claims are based upon nothing more than injuries allegedly suffered by a competitor, rather than on harm to competition in the relevant market. The Plaintiffs have not set forth facts in their Amended Complaint that would support the conclusion that the actions of the Defendants, which allegedly violated antitrust laws, were the necessary predicate of their injury or that they (Plaintiffs) were prevented from being the group which was permitted to present minor league baseball in the Dayton area, as a result of the antitrust violations. In *Hodges v. WSM, Inc.,* 26 F.3d 36 (6th Cir.1994), a case that was relied upon and discussed in *Valley Products, supra,* the plaintiffs alleged that the defendants had engaged in a conspiracy to restrain trade, in violation of § 1 of the Sherman Act. The Sixth Circuit affirmed the decision of the District Court to dismiss the plaintiff's

claim, pursuant to Rule 12(b)(6), because the plaintiffs had not and could not allege that they had suffered an antitrust injury. Rather, the Sixth Circuit held that the plaintiffs' injury flowed from the decision of Opryland, USA, to prohibit the plaintiffs from entering its property to discharge passengers, which it could have done regardless of whether that decision was part of an antitrust conspiracy. The Sixth Circuit also said that the plaintiffs' "injury was not an 'antitrust injury' because it did not result from any decrease in competition among shuttle operators." *Id.* at 39. Therefore, the alleged antitrust violation was not a necessary predicate for the plaintiffs' injury. Herein, the Plaintiffs' injury flows from the fact that only one group would be selected as the anointed monopolist in the minor league baseball market in the Dayton area, rather than from a decrease in competition among groups in that market. Moreover, since only one group would be selected to provide minor league baseball in this area, the Plaintiffs could have suffered the same injury had a group other than the Plaintiffs been selected, in the normal course of events, regardless of whether the Defendants had engaged in an alleged antitrust conspiracy. Accordingly, given that the Plaintiffs' injuries could have occurred absent conduct prohibited by antitrust laws, the alleged violations of those laws by the

Defendants are not the necessary predicate of the injuries which the Plaintiffs claim to have suffered.[18]

In reaching its conclusion, this Court is also persuaded by the logic of Judge Easterbrook's scholarly dissent in *Fishman v. Estate of Wirtz*, 807 F.2d 520, 563–585 (7th Cir.1986). *Fishman* arose out of competition between two groups over which would purchase the Chicago Bulls. Although the plaintiffs were able to secure a contract from the owner of that franchise, giving them the right to purchase that team, the defendants managed to prevent the plaintiffs from obtaining approval from the National Basketball Association for that sale, by refusing to enter into a lease agreement for the Chicago Stadium and by lobbying the league.[19] As a result, the defendants ultimately purchased the Bulls. The plaintiffs filed suit, and the District Court entered judgment in favor of the plaintiffs, finding that the defendants had violated §§ 1 and 2 of the Sherman Act, by refusing to enter into a lease agreement and by lobbying the NBA. On appeal, the Seventh Circuit affirmed in part and reversed in part, agreeing with the District Court that the defendants had violated that statute by refusing to enter into the lease agreement, since that the Chicago Stadium was an "essential facility,"[20] while concluding that

---

**18.** Moreover, in *Brunswick,* the Supreme Court stressed that an antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful" and that the "injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." 429 U.S. at 334, 97 S.Ct. 599. In *Atlantic Richfield,* the Supreme Court noted that an injury, "although casually related to an antitrust violation, nevertheless will not qualify as 'antitrust injury,' unless it is attributable to an anticompetitive aspect of the practice under scrutiny." 495 U.S. at 489, 110 S.Ct. 2014. Herein, it was always anticipated that the group, which was chosen to bring minor league baseball to the Dayton area, would be a monopolist in that product and geographic market, regardless of whether the Plaintiffs, the Mandalay Defendants or

some other group prevailed. It was always understood that there would be no competition among minor league baseball teams in this market. Since such competition would not exist, the Plaintiffs have not suffered an injury as a result of an anticompetitive act, effect or aspect.

**19.** One of the defendants was also part owner of that facility.

**20.** *In Directory Sales Management Corp. v. Ohio Bell Telephone Co.,* 833 F.2d 606 (6th Cir.1987), the Sixth Circuit discussed the essential facility doctrine:

The refusal to give competitors reasonable access to an essential facility is a form of anticompetitive behavior that will support a claim of monopolization. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 375, 93

**1174**

the defendants efforts to lobby the NBA did not constitute such a violation. Judge Easterbrook disagreed with the portion of the majority's opinion that affirmed the District Court. In analyzing the plaintiffs' antitrust claims, that judicial officer started from the factually unassailable position that:

> The change of ownership [of the Chicago Bulls] did not alter the structure of the market or the potential for new entry. It did not reduce the quantity produced, increase the price charged, or affect the quantity supplied. There is no claim of consumers' injury, actual or potential, now or in the future.

*Id.* at 563. Regardless of whether the plaintiffs or the defendants had purchased the Chicago Bulls, the successful group would have been a monopolist in the market found by the District Court (the presentation of live professional basketball games in the Chicago area). Based upon his analysis of antitrust law, including the doctrine of antitrust injury, Judge Easterbrook concluded that those statutes seek to prevent harm to competition in order to protect consumers.[21] Since, there was no evidence that consumers had been harmed by the defendants' actions, the plaintiffs could not have suffered an antitrust injury. *See* 807 F.2d at 585 ("This case should have resolved with the simple principle at the beginning of this opinion: unless the plaintiffs can make out a plausible case of consumers' injury, actual or plausible, now or tomorrow, there is no antitrust problem. Ours is a business tort in antitrust clothing.").[22]

Similarly, herein, given that the Plaintiffs have not alleged that the Defendants' actions limited the number of franchises that would be allowed to be located in the Dayton area, there is no allegation that the actions of the Defendants altered the market structure for minor league baseball in the Dayton area, increased prices or reduced the quantity of minor league baseball supplied in that area. In short, there are no allegations that the Defendants' actions curtailed competition in the minor league baseball market in the Dayton area, only that those actions curtailed the Plaintiffs' ability to be the entity servicing that market. Only one minor league team would be located in the Dayton area, regardless of whether the Plaintiffs, the

S.Ct. 1022, 35 L.Ed.2d 359 (1973). The essential facility doctrine, also called the bottleneck principle, states that where facilities cannot practicably be duplicated by would-be competitors, those in possession of them must allow them to be shared on fair terms. It is illegal restraint of trade to foreclose [use of] the scarce facility.

*Id.* at 612 (citation and internal quotation marks omitted). *See also, Mid–South Grizzlies,* 720 F.2d at 787 (concluding admission to a sports league is not an essential facility). Thus, the majority in *Fishman* concluded that the Chicago Stadium was an essential facility, because it was the only location in the Chicago area where professional basketball could be played, and, further, since it would have been impractical to duplicate that facility.

21. *See also, Clorox Co. v. Sterling Winthrop, Inc.,* 117 F.3d 50, 57 (2nd Cir.1997) ("The antitrust laws protect consumers by preventing agreements that unreasonably restrain overall competition"); *Ehredt Underground, Inc. v. Commonwealth Edison,* 90 F.3d 238, 240 (7th Cir.1996) ("antitrust [laws are] designed to protect consumers"); *SCFC ILC, Inc. v. Visa USA, Inc.,* 36 F.3d 958, 972 (10th

Cir.1994) (same). Thus, in *Brunswick,* the plaintiff had not suffered an antitrust injury, because consumers would be helped by the competition that would continue as a result of the defendant's merger that allegedly violated § 7 Of the Clayton Act. In *Atlantic Richfield,* the plaintiff had not suffered an antitrust injury, because consumers would benefit from the increased competition that would result from the defendant's vertical conspiracy to set maximum retail prices above a predatory level.

22. It bears emphasis that the dispute between Judge Easterbrook and the majority in *Fishman* was over the aspect of the plaintiffs' antitrust claims predicated upon the defendants' violation of the essential facilities doctrine, by refusing to agree to lease the Chicago Stadium to the plaintiffs. Judge Easterbrook concluded that the plaintiffs had not suffered an antitrust injury. Herein, the Plaintiffs do not allege that the Mandalay Defendants or any other Defendant similarly violated that doctrine.

Mandalay Defendants or some other group were the successful competitor for the right to become the owner of that team. In other words, there was bound to be one winner and one loser of that competition, and one and only one monopolist would emerge to provide minor league baseball in this area. While there is an allegation, but no facts alleged to support the conclusion that the Defendants' alleged violations of the Sherman and Valentine Acts caused an injury to consumers by restricting competition,[23] the Court concludes that the Plaintiffs have not sufficiently alleged that they have suffered an antitrust injury. Regardless of whether the actions of the Defendants may have affected competition in the market to acquire minor league baseball teams, generally, or the team that would be permitted to be located in the Dayton area, specifically, the Plaintiffs have not alleged that they have suffered an antitrust injury, in the absence of the contention that those actions have harmed consumers. In other words, although the

actions of the Defendants may have harmed one of the groups competing to bring minor league baseball to this area and, further, while those actions may constitute business torts, those actions did not cause the Plaintiffs to suffer an antitrust injury, since they did not prevent the Plaintiffs from being one of two or more groups presenting minor league baseball in this area. It was always understood that Dayton would be a one-team market.[24] There is no allegation, in short, that the Defendants' actions curtailed competition in the minor league baseball market in this area, by hurting one group's ability to compete in a multi-team market.

In sum, the Court concludes that, where two groups compete for one right, the losing group does not have a valid antitrust claim, merely because the winning side conspired with those who would make the award and acted tortiously. An example demonstrates the Court's point. A and B compete with each other to enter into a contract with C. The fact that A obtains

**23.** In most conclusory fashion, the Plaintiffs allege that the public has been denied the benefits of competition, free from the allegedly illegal restraints of which they complain. However, the Plaintiffs do not allege how that denial has caused consumers to be harmed. *See In re DeLorean*, 991 F.2d at 1240 (explaining that, although Rule 12(b)(6) incorporates a liberal standard, "it requires more than the bare assertion of legal conclusions").

**24.** The Plaintiffs rely upon *Piazza v. Major League Baseball*, 831 F.Supp. 420 (E.D.Pa. 1993). Therein, the plaintiffs alleged, *inter alia*, that the defendants had violated the Sherman Act by refusing to allow them to purchase the San Francisco Giants and move that franchise to Tampa, Florida. The District Court overruled the defendants' motion to dismiss, concluding that the plaintiffs had sufficiently alleged that there had been harm to competition in the relevant market, to wit: the market for the ownership of professional baseball franchises, generally, and the San Francisco Giants, in particular. Herein, the Plaintiffs also allege that the relevant market is for the ownership of minor league baseball franchises. However, assuming that the Plaintiffs have alleged that the Defendants harmed competition in that market, the Court nevertheless cannot conclude that they have

alleged that they have suffered an antitrust injury, since they have not alleged facts that would support a finding that consumers were harmed as a result. Since the Court follows Judge Easterbrook's persuasive analysis which focuses upon the question of whether the defendants' actions have caused harm to the consumers, it declines to follow *Piazza*. Indeed, in that litigation, the District Court did not consider whether the alleged anticompetitive actions of the defendants had caused harm to consumers. It bears emphasis that antitrust laws were designed "to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business." *Ehredt Underground*, 90 F.3d at 240. The Plaintiffs' antitrust claims are not premised on the theory that the Defendants' illegal actions harmed consumers. Rather, the Plaintiffs, as one group seeking to become the "producer" of minor league baseball in the Dayton area, allege that the other potential producer has acted in concert and conspired with the Midwest League, the NAPBL and others to prevent them (Plaintiffs) from becoming *the* producer of minor league baseball in the Dayton area. Thus, the Plaintiffs seek to use the antitrust laws to protect them from other producers, rather than to protect the interests of consumers.

**1176**

the contract by bribing C does not give B a valid antitrust claim against A, even though its ability to compete for the contract with C has been compromised by the fact that A acted in concert with C, by bribing the later, in the absence of proof that the concerted activity harmed consumers by reducing output or raising prices.

Based upon the foregoing, the Court concludes that the Plaintiffs have not alleged that they suffered an antitrust injury.[25] Rather, they have asserted nothing more than business torts that allegedly harmed a competitor. Accordingly, the Court sustains the Mandalay Defendants' Motion to Dismiss (Doc. # 15).[26]

---

**25.** Since the Court so concludes, it is not necessary to address the Mandalay Defendants' alternative arguments that the Plaintiffs have failed to allege adequately that they (the Mandalay Defendants) engaged in a conspiracy or concerted action or that they possessed monopoly power.

**26.** Although only the Mandalay Defendants, have moved for dismissal of the Plaintiffs' antitrust claims, the Court cannot conceive that those claims, as they are presently drafted and as they relate to the other Defendants, retain viability, in light of the Decision herein. Accordingly, the Court directs the other Defendants, except Dayton and the DDP, which are not named in the Defendants' antitrust claims, to move for dismissal of same, within 20 days from date.